**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMINA ELZENEINY,

    Plaintiff,

       v.

DISTRICT OF COLUMBIA,

    Defendant.

Civil Action No. 09-889 (JEB)

<u>**MEMORANDUM OPINION**</u>

Starting in January 2003, Plaintiff Amina Elzeneiny worked as a Budget Analyst for the District of Columbia's Office of Budget and Planning in its Office of the Chief Financial Officer. Shortly after she began, she informed the Office that she suffered from fibromyalgia, a condition that causes muscle and joint pain, as well as chronic fatigue. In the years that followed, she requested a variety of accommodations from her employer, such as the ability to work on a flexible schedule. The District agreed to nearly all of her requests. Plaintiff nonetheless complains that months (and, in one instance, even years) often passed before it did so. She also alleges that she was harassed and retaliated against by, *inter alia*, being accused of wrongdoing despite a lack of evidence and being given negative and unsubstantiated feedback in her performance evaluations.

In the last few years of her tenure with OBP, Plaintiff's condition worsened, and she sought to take extended medical leave on two occasions. She maintains that she was wrongly denied such leave the second time around, and that she was retaliated against for taking this time off. Indeed, she claims that she was wrongfully terminated because she took leave, and, when she was reinstated to her position after she appealed, she was transferred to a different office

1

where she had fewer responsibilities.  She ultimately tendered her resignation approximately six

months later in 2011 and now claims that she was constructively discharged.

Citing this history, Plaintiff brought this suit against the District of Columbia under the

Americans with Disabilities Act, the D.C. Human Rights Act, and the Family and Medical Leave

Act.  Following years of extended proceedings in this case, the District now moves for summary

judgment.  In doing so, it first argues that the three counts added in her First and Second

Amended Complaints – *i.e.*, for interference with her rights under the FMLA (Count III),

retaliation under the ADA (Count IV), and retaliation under the FMLA (Count V) – should be

dismissed because she did not make herself available for a deposition after including those

causes of action.  Although further extending pretrial proceedings is hardly a salubrious

outcome, the Court believes that rescheduling her deposition is more justifiable than dismissing

Counts III-V now.

The District also contends that much of the conduct Plaintiff complains of in the

remaining two counts cannot be pursued in this Court.  With respect to her DCHRA claim

(Count II), for instance, the city notes that she elected to pursue administrative remedies, instead

of filing suit, for conduct that took place prior to March 10, 2008.  As to her other ADA claim

(Count I), it asserts that she did not timely file an EEOC charge for much of the activity, which is

a prerequisite to bringing such a claim.  Considering what remains of these two counts, the

District believes it is entitled to judgment as a matter of law because it acted in good faith,

granted nearly every accommodation that she requested, did not subject her to a hostile work

environment, and did not create an environment so severe as to justify her resignation.  Given its

commendable conduct in addressing Elzeneiny's litany of complaints, the Court largely agrees;

as a result, it will grant Defendant's Motion for Summary Judgment on Counts I-II as to almost every allegation.

I.      **Background**

        A.  Factual Background

        Piecing together the facts in this case is no easy task; the parties' submissions are often sparse on details, including the timing of particular events.  The Court has nonetheless done its best to provide a coherent narrative.  In doing so, it has credited Plaintiff's evidence and drawn all justifiable inferences in her favor, as she is the nonmoving party.

        Plaintiff joined OBP as a Budget Analyst on January 6, 2003.  See Opp., Exh. 2 (Declaration of Amina Elzeneiny), ¶ 2.  Shortly after, she informed Gary Ayers, the Branch Chief for Administration, that she suffered from fibromyalgia, which causes muscle and joint pain, as well as chronic fatigue.  See id., ¶ 3; Mot., Exh. 2 (Deposition of Amina Elzeneiny) at 15:7-20; Mot., Exh. 3 (Interrogatory Responses of Gary Ayers), Ans. No. 3.  At the same time, she requested that she be allowed some flexibility in reporting to work in the morning because she sometimes had "problem[s] with coming in, in the morning, at eight o'clock every day, for example."  Elzeneiny Depo. at 17:5-18:4.

        Six months later, Plaintiff provided Ayers with two letters from her rheumatologist, Richard A. Wilson, Jr., both of which were dated August 7, 2003.  See Mot., Exh. 5 (Letter from Richard A. Wilson, Jr., M.D., August 7, 2003) (Wilson Letter 1); Exh. 6 (Letter from Richard A. Wilson, Jr., M.D., August 7, 2003) (Wilson Letter 2).  The letters indicated that Dr. Wilson's office had been treating Elzeneiny for some time and that she had been diagnosed with fibromyalgia.  See Wilson Letter 1; Wilson Letter 2.  They further stated that, "based on her medical condition, [she] should be allowed some flexibility in her work schedule" and "should . .

. be given access to a 'handicapped access card.'"  Wilson Letter 1.  The latter request was made because the building entrance she normally used had "some big stairs" and was farther away. Elzeneiny Depo. at 90:1-19.

Roughly three months later, on October 30, 2003, Ayers sent an e-mail to the security office indicating that Elzeneiny should be granted handicapped access to the building.  See Mot., Exh. 11 (E-mail from Ayers to PSD Access Control (Oct. 30, 2003, 3:38 PM)).  About three weeks after that, he wrote to Plaintiff indicating that "pending further medical/legal review and decision," she would be given "a special exception to the standard OBP flextime policy."  Mot., Exh. 7 (E-mail from Ayers to Elzeneiny (Nov. 21, 2003, 12:33 PM)).  Specifically, she would "be allowed to attach [her] doctor's letter to a signed flextime form as the only required proof of [her] compliance with [the office's] flextime policy."  Id.  He also informed her that she would "be allowed to sign-in on a liberal, non-predetermined flextime basis, as long as [she] maintain[ed] a standard 40-hour work week," that she would "be allowed to perform some work at home," and that she would also be given a notebook computer for "work-at-home purposes." Id.

In December of that year, Plaintiff was asked to move to a cubicle closer to the Branch Chief's office.  See Mot., Exh. 9 (E-mail from Ayers to OBP – All Staff (Dec. 4, 2003, 4:47 PM)).  The parties dispute whether she was the only staff member asked to relocate, compare Elzeneiny Depo. at 48:15-17 with Ayers Interrogs., Ans. No. 9; in any event, she felt that she could not do so because it would require her to reorganize her desk during a very busy time, and she was fatigued and in pain as a result of her condition.  See Elzeneiny Depo. at 51:8-52:4.  She thus promptly contacted her internist, Dr. Mahmoud Mustafa, to discuss the move.  See id. at 46:4-17.  She claims that while she was on the phone, Ayers "stood behind [her] right at the

cubicle . . . for 45 minutes." Id. at 46:18-21.  He did so despite the fact that she told him she was on a personal call.  See id. at 46:1-18.

Afterwards, Dr. Mustafa sent Dallas Allen, the Director of Budget Formulation, a letter indicating that he was "concerned" that Elzeneiny's medical issues had not been "fully taken into consideration regarding the proposed re-location of her work station" and "requesting that [the office's] decision to relocate Ms. Elzenieny [*sic*] be re-evaluated after an in depth review of her disability."  Mot., Exh. 10 (Letter from Mustafa to Allen, Dec. 10, 2003).  Although the agency's EEO Officer, Teresa Wilson, concluded that "management's request for [Plaintiff] to relocate was 'reasonable,' and did not present an undue burden on [her]," "OBP ultimately granted her request" to remain at her work station.  See Ayers Interrogs., Ans. No. 9.; see also Elzeneiny Depo. at 49:17-20.

Over the next several months, in the Spring of 2004, C. Ayo Bryant, the Special Assistant to the Director, indicated in two separate memoranda that Elzeneiny had been approved for a variety of accommodations.  The first memo, dated February 26, 2004, stated that Elzeneiny was approved for: 1) "an ergonomic chair with specifications designed to meet the particular needs of [her] disability"; 2) a "flexible arrival time" and permission to "work as many or as few hours each workday . . . so long as [she] complete[d] eighty hours in a two-week tour of duty"; 3) "a desktop printer . . . located in [her] workspace"; 4) "Handicap Access to the Wilson Building Worksite"; 5) "approval to travel by Taxi rather than Metro rail for work-related local travel"; and 6) permission to remain at her workstation "until and unless an adjustment is indicated as the result of a significant business operation change."  Mot., Exh. 12 (Memorandum from Bryant to Elzeneiny, Feb. 26, 2004).

The second memo, dated May 7, 2004, reiterated these accommodations and stated that she was also approved to use "a laptop on an as needed basis upon [her] request," even though OBP had generally "limited the regular use of laptop computers to . . . Branch chiefs and above." Mot., Exh. 13 (Memorandum from Bryant to Elzeneiny, May 7, 2004).  This later memo also stated that any of "[t]he accommodations . . . that ha[d] not already been provided [would] become effective on Monday May 10, 2004," and that the office would "schedule a follow-up meeting at the end of ninety days . . . to review the effectiveness of the accommodations with [her]."  Id.

Apparently, however, the problems continued, and Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission and the D.C. Office of Human Rights on December 19, 2005.[1]  See Opp., Exh. 1 (December 19, 2005, Charge of Discrimination); Elzeneiny Decl., ¶ 7.  In it, she alleged discrimination on account of the fact that "[b]etween August 2003 thru December 2004," she had "requested the use of flextime, telecommuting, filing cabinets, to stay in [her] cubicle, a labtop [sic], handicap access, a desk top printer among other requests," and that although she "received several of the requested accommodations," she did so only "after a long and protracted battle with [Defendant]." December 19, 2005, Charge of Discrimination.  She also alleged that she had been "subjected . . . to harassment," as evidenced by the fact that she was asked to move to a new cubicle, office personnel attempted to contact her doctor without her permission, Ayers stood over her while she talked on the phone with her doctor, staff made comments to her supervisor that they felt sorry for him having to supervise her, negative comments were included in her "passback folders[,] which are openly seen by the whole office," and she was "accus[ed] . . . of wrong doing with no

---

[1] As discussed in Section III.C.2.a, infra, the parties dispute whether she filed this charge on December 19, 2005, or March 28, 2006.

evidence that there was any wrongdoing." Id. at 2.  She last claimed that the Office had

retaliated against her by not giving her extra projects, not including "commendations . . . in [her]

evaluations," admonishing her in her FY2004 evaluation for asking for an extension on a project,

incorporating unsubstantiated allegations in her June 2005 mid-year evaluation, and failing to

promote her despite the fact that others who joined the office later had been.  See id.

     In December 2006, as these complaints churned through the administrative process,

Plaintiff tore a tendon in her right arm, unrelated to her fibromyalgia.  See Elzeneiny Depo. at

78:9-11; 79:3-4.  Her doctor thus requested that she be given speech-recognition software.  See

id. at 78:9-14.  Following her surgery in February, he also asked that she "be allowed to work

from home."  Id. at 78:14-18; Mot., Exh. 16 (Letter from Mahmoud H. Mustafa to Angell

Jacobs, Mar. 13, 2007).  Both requests were approved, and the Office paid approximately $3,000

to provide her with voice-activated software.  See Elzeneiny Depo. at 78:18-79:2; Ayers

Interrogs., Ans. No. 7.  Sometime in 2007, the Office also permitted her to use the Virtual

Private Network (VPN) so that she could access her work files more easily from home.  It had,

however, taken "two or three years" to get this.  See Elzeneiny Depo. at 98:5-100:14; Elzeneiny

Decl., ¶ 5.

     Eventually, in October 2007, OHR issued a "No Probable Cause" Determination.

Elzeneiny appealed, but the agency affirmed its assessment in March 2008.  According to

Plaintiff, "Shortly after" this final ruling, "Defendant removed all of [her] accommodations until

March 2009."  Elzeneiny Decl., ¶¶ 8-9.  Defendant's evidence indicates that OBP did notify

Plaintiff on April 3, 2008, that it was "reinstating the terms of the February 24, 2004 reasonable

accommodation memorandum," and thus "was terminating [its] temporary authorization to sign-

in on a liberal, non-predetermined flextime basis, which was granted to accommodate [her]

recovery from surgery."  Mot., Exh. 17 (Declaration of Sumita Chaudhuri), Exh. 2

(Memorandum from Sumita Chaudhuri to Elzeneiny, Aug. 18, 2008).  In accordance with the

terms of the 2004 agreement, she would have flexibility to work days of non-standard length so

long as she completed 80 hours every two weeks between the hours of 7:30 a.m. and 8:00 p.m.,

Monday through Friday.  See id.  She would, however, have to "adhere to OBP's normal time

and attendance procedures, including prior approval from [her] supervisor for use of leave."  Id.

The Office indicated that it would review the accommodations in six months.  See id.

In February 2009, the Office issued another memorandum, this time in response to a

letter that Dr. Mustafa wrote on January 6, requesting that Elzeneiny be allowed to work from

home.  See Chaudhuri Decl., Exh. 3 (Memorandum from Chaudhuri to Elzeneiny, Feb. 23,

2009).  The memo stated that she was authorized to work from home under three conditions: 1)

that she notify her supervisor of her intent to do so not later than 7:30 a.m. on the day she

planned to work from home; 2) that she keep "annotated time sheet[s] of the hours . . . worked";

and 3) that the hours "comport to OBP working hours" − i.e., Monday through Friday, 7:30 a.m.

to 8:00 p.m.

Yet by March of that year, Elzeneiny's health had "deteriorated," so she "went on

approved FMLA leave per [her] doctor's orders."  Elzeneiny Decl., ¶ 9.  This FMLA leave was

set to expire on July 10, though she did not return at that time.  See Mot., Exh. 18 (Declaration of

James Spaulding), Exh. 1 (E-mail from Spaulding to Teresa Wilson (Aug. 18, 2009, 10:22 AM)).

Instead, on August 4, 2009, before she returned to work, Dr. Mustafa wrote a letter to the agency

noting, "In the past several months, I have recommended on more than one occasion that Ms.

Elzeneiny be provided the accommodation of the flexibility of working from home when

necessary with flexible hours pursuant to the Americans with Disabilities Act," and that it was

his "understanding that these accommodations were taken away from her in April 2008."
Spaulding Decl., Exh. 2 (Letter from Mustafa to OBP, Aug. 4, 2009).  He continued, "Over the
past several months, due to the stress in having to work during normal working hours without the
flexibility of working from home and other accommodations, I noticed a worsening of Ms.
Elzeneiny's fibromyalgia symptoms both in severity and duration," and that, "[a]s a result, it was
recommended that she take FMLA leave, which she did."  Id.  Though "her symptoms ha[d]
improved while on leave and she [wa]s able to perform the essential functions of her job," he did
not recommend that she return to work under the same conditions on which she left.  Id.  Indeed,
it was his "strong recommendation that Ms. Elzeneiny only return to work at [that] time if she
[wa]s afforded the accommodation of working from home with flexible hours, first on a fulltime
basis until [he] evaluate[d] her in 3 to 4 weeks."  Id.  On a more permanent basis, he "strongly
recommend[ed] that she be afforded the accommodations of working from home on an as needed
basis with a flexible work schedule as she had prior to April 2008."  Id.  He concluded that
Plaintiff was "ready to return to work on August 10, 2009."  Id.

　　　Plaintiff ultimately returned on August 25.  See Elzeneiny Decl., ¶ 9.  James Spaulding,
the Associate Deputy CFO, expressed concerns about providing her with any additional
accommodations because OBP had to re-work and re-publish the budgets that year and had
"fewer staff . . . to handle this workload."  E-mail from Spaulding to Wilson (Aug. 18, 2009,
10:22 AM)).  In his view, "offer[ing] additional accommodations – such as a return to the
accommodation she had for her post-surgery period – would greatly diminish [the office's]
ability to deliver for the Mayor and Council."  Id.

　　　Nevertheless, on September 1, 2009, he sent Plaintiff a memorandum granting the request
for flexible hours, although with limitations.  See Spaulding Decl., Exh. 3 (Memorandum from

Spaulding to Elzeneiny, Sept. 1, 2009).  Specifically, over the following four weeks, she would

be permitted to work from home for 32 hours in any 80-hour pay period, but those hours had to

be performed during OBP's working hours − *i.e.*, Monday to Friday, from 7:30 a.m. to 8:00 p.m..

See id.  She would also need to notify her supervisor of her intent to work from home "not later

than 8:30 am" on the date she planned to do so.  Id.  The memo concluded by delineating her

duties and responsibilities that could be performed from home and those that could not be.  See

id.  Spaulding has since explained that the accommodation was "consistent with most of the

requests made by her doctors," but that "[b]ecause of the need for a Budget Analyst to speak to

agency finance staff, managers, and budget book production staff, . . . [the office] did not

authorize work for credit at 5:00 a.m. or 10:00 p.m. as suggested in Dr. Mustafa's statement."

Spaulding Decl., ¶ 7.

     The accommodation approved in this September 1st memo ultimately "continued beyond

the three to four week period granted."  Mot., Exh. 19 (Declaration of Gordon McDonald), ¶ 4;

see McDonald Decl., Exh. 1 (Memo from McDonald to Elzeneiny, Jan. 29, 2010).  Dr. Mustafa

nevertheless sent a letter on December 7, 2009, "express[ing] concern over OBP's lack of

response to his recommendation that Ms. Elzeneiny be allowed to work from home at her

discretion without prior notice or approval from a supervisor."  McDonald Decl., ¶ 4.  Gordon

McDonald, the Deputy Chief Financial Officer, thus wrote a memorandum to Plaintiff reiterating

that she could work up to 32 hours from home per pay period, and that she could "work days of

non-standard length" so long as the hours were completed between 7:30 a.m. and 8:00 p.m.

Monday through Friday.  See January 29, 2010 Memo.  He explained that "[f]or business

reasons," however, the Office could not provide additional accommodations.  Id.  Specifically,

"OBP's work environment [wa]s constantly changing and evolving," and although they had "set

10

. . . schedules and calendars, . . . emergencies constantly ar[o]se with little to no notice, which

mean[t] that an analyst working from home might not easily be able to meet the demands of the

office." Id.  As far as the Court can tell, this accommodation remained in place over the next

year.

Then, on March 10, 2011, Elzeneiny submitted a second leave request, but on March 17,

it was denied.  See Mot., Exh. 20 (Declaration of LaSharn Moreland), ¶ 3.  A few days later,

Plaintiff's employment was terminated.  See id., ¶ 4.  According to the District, it was because

her supervisor, Eric Cannady, believed she was unable to perform the job competently.  See

Def.'s Statement of Facts, ¶ 41; see also Mot., Exh. 1 (Declaration of Eric Cannady), ¶¶ 2, 4-5.

Despite this purported justification, however, the agency reinstated Elzeneiny after she appealed

her termination and "it was determined that an administrative error occurred and her FMLA

eligibility should have been considered under both Federal and District FMLA."  Moreland

Decl., ¶ 5.

Not long after Elzeneiny returned to work, she was reassigned to a budget-analyst

position in another department, based on "her skills and inability to work in a fast paced

environment."  Id., ¶ 6.  According to the District, she was thus "returned to the same position,

but to a worksite that was less demanding"; there was no "loss in seniority, grade or pay."  Id.

Plaintiff avers, however, that in the new position she "was essentially given no work to do," and

"[w]hat little work [she] was given involved data entry or copying."  Elzeneiny Decl., ¶ 11(*l*).

From her point of view, "[t]he position to which [she] was reassigned had no chance of career

advancement . . . because [she] was no longer performing the budget analyst duties [she] had

been performing."  Id., ¶ 11(m).  She thus resigned six months later, in November 2011.  See

Moreland Decl., ¶ 7.

B.  Procedural Background

This case has wended its long and tortuous way through many procedural stages, and the relevant ones are recounted in considerable detail in the Analysis section *infra*.  It is enough to say here that Plaintiff first filed this suit against the District, its Chief Financial Officer (Natwar Gandhi), and OCFO on May 13, 2009, long before her ultimate resignation, and the case was initially assigned to Judge Colleen Kollar-Kotelly.  See ECF No. 1.  Her Complaint asserted claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and the D.C. Human Rights Act, D.C. Code § 2-1401.01 *et seq.*  Defendants subsequently moved for partial dismissal, and on March 29, 2010, Judge Kollar-Kotelly issued an Opinion dismissing Gandhi and OCFO from the suit; she also dismissed Plaintiff's Title VII claim, as well as her DCHRA claim to the extent it sought unliquidated damages.  See Elzeneiny v. District of Columbia, 699 F. Supp. 2d. 31 (D.D.C. 2010).  The case was then transferred to this Court in the spring of 2011.  See Docket Entry, March 29, 2011.

As the litigation progressed, Plaintiff twice successfully moved to amend her Complaint.  Her First Amended Complaint, filed on October 31, 2011, added a cause of action under the Family and Medical Leave Act.  Her Second Amended Complaint, filed on November 22, 2013, added two counts – the first augmented her retaliation claim under the ADA, and the second expanded her retaliation claim under the FMLA.  As it currently stands, the operative Second Amended Complaint comprises the following counts: ADA Violation (Count I), DCHRA Violation (Count II), FMLA Violation (Count III), Retaliation under ADA (Count IV), and Retaliation under FMLA (Count V). Now, following the close of a second period of discovery, the District moves for summary judgment.

II.    **Legal Standard**

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Liberty Lobby, 477 U.S. at 247-48; Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007). The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor. Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir.

1987).  If the nonmovant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted.  Liberty Lobby, 477 U.S. at 249-50.

## III.    Analysis

The District's Motion for Summary Judgment presents several issues for decision.  First, the city contends that Counts III-V of Plaintiff's Second Amended Complaint should be dismissed because she failed to "cooperate[] with discovery and . . . prosecute [these] new claims."  Mot. at 13.  It then insists that it is entitled to judgment as a matter of law on her DCHRA claim (Count II) to the extent it is based on conduct prior to March 10, 2008, because she elected to pursue administrative remedies for those acts instead.  As for Plaintiff's general ADA claim (Count I), it urges that she is barred from challenging much of the allegedly unlawful conduct because she did not timely file an EEOC charge related to such acts.  As to what remains of these two counts, the District next argues that it acted in good faith and provided her with nearly every accommodation she requested.  It also maintains that the conduct Elzeneiny complains of simply does not rise to the level of a hostile work environment and was not so unbearable as to establish a constructive discharge.

As a threshold matter, the Court first addresses Plaintiff's contention that it should disregard the declarations submitted in support of Defendant's Motion because they are legally deficient.  Deciding otherwise, the Court next considers whether Counts III-V should be dismissed as a discovery sanction.  It thereafter moves to Counts I-II, looking first at their permissible scope and finally at the merits of what is left standing.

### A.    Admissibility of Declarations

Elzeneiny initially argues that the declarations the District submitted in support of its Motion are legally invalid and should not be considered.  See Opp. at 2-3.  She identifies three

specific flaws. First, in contravention of Federal Rule of Civil Procedure 56(c)(4),[2] the declarations state that they were made "to the best of the declarant's knowledge, information and belief," rather than solely on the declarant's personal knowledge. <u>See</u> Opp. at 2. Second, also in violation of that rule, they did not affirmatively state that the declarants are competent to testify to the matters addressed therein. <u>See id.</u> Finally, the declarants did not aver under penalty of perjury that the statements were true and correct, as required by 28 U.S.C. § 1746 and Local Rule 5.1(h). <u>See id.</u> at 2.

The Court agrees that Defendant's declarations were sloppily drafted. It does not, however, believe that it must disregard them in their entirety. The last of the defects – *i.e.*, the failure to attest under penalty of perjury that the affidavits are true and correct – has now been remedied, as the District refiled each of them with the necessary averment. <u>See</u> Reply, Exh. 26 (Refiled Affidavits). This is sufficient. <u>See Hainey v. Dep't of the Interior</u>, 925 F. Supp. 2d 34, 41 n.5 (D.D.C. 2013) ("[W]hile the Court reiterates that Mr. Lohr's original affidavit satisfied the requirements of § 1746, the unequivocal statement in his revised declaration removes any and all doubt."). (The Court, for ease of reference, cites the original declarations, which are the same in substance.)

The two remaining flaws present a slightly tougher issue. "A principal command of Rule 56[(c)(4)] is straightforward: 'Supporting and opposing affidavits' on summary-judgment motions 'shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'" <u>Longdrigan v. FBI</u>, 670 F.2d 1164, 1174 (D.C. Cir. 1981). And "[a]lthough the rule's

---

[2] Plaintiff cites to subsection (e) of Rule 56, but when the Rules were amended in 2010, the provision addressing the requirements for declarations and affidavits was moved to subsection (c)(4). <u>See</u> Fed. R. Civ. P. 56 Adv. Comm. Note (2010 Amends.).

directive with respect to the admissibility of an affidavit's contents on summary judgment has

been liberally construed, its requirement of personal knowledge by the affiant is unequivocal,

and cannot be circumvented.  An affidavit based merely on information and belief is

unacceptable."  Id. (citations omitted).  The D.C. Circuit has thus struck portions of an affidavit

that could not have been made on personal knowledge and on which the affiant was therefore

incompetent to testify.  See id. at 1174-75 (finding affiant not competent to testify to several

matters because a "[c]areful reading" of affidavit "reveals that a great deal of what it says could

not possibly have been based on the affiant's personal knowledge").  Where declarations have,

moreover, stated that they are made on knowledge and belief and do not clearly demonstrate the

affiants' personal knowledge of the facts, the circuit has found it inappropriate to rely on them at

summary judgment.  See Harris v. Gonzales, 488 F.3d 442, 446 (D.C. Cir. 2007).

Because Defendant's declarations here state that they are made on "knowledge,

information and belief," the Court treads carefully in relying on them.  It accepts only those

statements in the declarations that clearly indicate personal knowledge, see, e.g., Moreland Decl.,

¶ 4 ("I received a termination request for Ms. Elzeneiny . . . .  I reviewed and approved the

termination request."), or are supported by adequate documentation.  See, e.g., Moreland Decl., ¶

4 ("[O]n April 27, 2011, the Agency reinstated Ms. Elzeneiny and approved her FMLA, effective

March 9, 2011.") (citing "Exhibit 6"); Moreland Decl., Exh. 6 (Letter from Moreland to

Elzeneiny, Apr. 27, 2011) ("This letter reverses your March 22, 2011 termination letter and

reinstates you with the Office of the Chief Financial Officer (OCFO).  Per your request, the

OCFO is placing you on Family Medical Leave (FMLA) effective March 9, 2011.").  The Court

believes that this determination strikes the appropriate balance.

16

B. <u>Counts III-V</u>

The next threshold issue is the causes of action properly before the Court.  In its Motion, the District urges dismissal of Counts III-V – *viz.*, FMLA violation, ADA retaliation, and FMLA retaliation − of the Second Amended Complaint as a sanction for Plaintiff's "dilatory conduct" during discovery.  <u>See</u> Mot. at 20.  More specifically, it asserts that Elzeneiny "refus[ed] to make herself available for a deposition" after lodging supplemental claims in her Amended Complaints, and that such refusal constituted a "clear violation" of an order from this Court.  <u>See</u> Mot. at 16, 20.  In support of its request, it invokes Federal Rule of Civil Procedure 37(b)(2)(A), which authorizes sanctions when a party "fails to obey an order to provide or permit discovery," as well as Rule 41(b), which states that "a defendant may move to dismiss the action or any claim against it" where a plaintiff "fails to prosecute or to comply with these rules or a court order."  Yet, while the Court possesses "broad discretion to impose sanctions for discovery violations," <u>Bonds v. Dist. of Columbia</u>, 93 F.3d 801, 807 (D.C. Cir. 1996), it does not believe such measures are appropriate here.

A brief recitation of the procedural history leading up to the present Motion may prove useful.  Elzeneiny initiated this suit on May 13, 2009, alleging discrimination and retaliation in breach of the ADA (Count I) and the DCHRA (Count II).  <u>See</u> Compl., ¶¶ 16-25.  Defendant subsequently deposed her on December 1, 2010, <u>see</u> Elzeneiny Depo., and discovery closed just a few weeks later.  <u>See</u> ECF No. 18 (Order of December 8, 2010).

Such pause, however, was merely temporary.  In the ensuing years, Plaintiff twice amended her pleadings – each time with Defendant's consent.  <u>See</u> ECF No. 42 (October 28, 2011, First Motion to Amend Complaint); ECF No. 64 (November 20, 2013, Second Motion to Amend Complaint).  Both amendments added claims based on new factual developments.  The

first time around, she incorporated a claim for violations of the FMLA (Count III).  See First

Am. Compl., ¶¶ 28-36.  In the next iteration, she added separate counts for retaliation under the

ADA (Count IV) and FMLA (Count V).  See Sec. Am. Compl., ¶¶ 34-57.

The Court, accordingly, issued a new Scheduling Order on December 4, 2013, which

reopened discovery for the supplemental counts through March 7, 2014.  That deadline was later

extended on multiple occasions, see Minute Orders of March 3, 2014, May 5, 2014 and July 2,

2014, in large part due to scheduling difficulties.  In particular, Elzeneiny had since moved back

to her native Egypt, and, due to health and monetary constraints, she required "ample time to

obtain a reasonably priced plane ticket to come to the United States for her deposition."  ECF

No. 70 (July 1, 2014, Motion for Extension of Time).

On October 9, 2014, ten months after reopening discovery, the Court held a status

conference.  At that hearing – which the Court has reviewed by listening to the audio recording –

it told both parties that this long-delayed case simply had to move forward.  In pursuit of that

ambition, the Court directed that Elzeneiny's deposition be taken in the District of Columbia

within 45 days.  See October 9, 2014, Minute Order ("[T]he Court ORDERS that . . . Plaintiff's

deposition shall take place in Washington, DC, by November 24, 2014 . . . .").  Notwithstanding

the Court's unambiguous directive, however, Plaintiff's deposition remains outstanding.

Defendant lays the blame for that lapse squarely at Elzeneiny's feet.  According to the

District, "The burden was on Plaintiff to comply with the Court's order and Plaintiff failed to do

so."  Reply at 6.  Indeed, says Defendant, "Plaintiff intentionally refus[ed] to return to the

District for a deposition in clear violation of this Court's order of October 9, 2014."  Mot. at 20-

21.  It further notes that "she did not seek an extension" or "a modification of the order," and

instead "simply chose to ignore the order."  Mot. at 21.  Defendant also states that it sent an e-

mail to Plaintiff's counsel on November 7, 2014, inquiring about dates for the deposition, but it received no response. See Reply, Exh. 27 (E-mail from David Jackson to Kathy Potter (Nov. 7, 2014, 4:01 PM)). It believes that such dereliction on Plaintiff's part warrants sanctions.

Elzeneiny tells a different story. She maintains that she "has at all times been prepared to make herself available for deposition." Opp. at 3. She additionally contends that the October 9, 2014, Minute Order "did not impose upon [her] a duty to set her own deposition," that her counsel did not receive the November 7, 2014, e-mail, and – most fundamentally – that she did not "willfully or otherwise disobey this Court's order." See id. at 6-8. Rather, as she recounts, her physician advised her after the status conference that she should not travel in light of her ongoing medical issues. See id. at 7; id., Exh. 2 (Note from Dr. Hussien H. Rizk, October 21, 2014). Although she remained willing to travel to the United States for a deposition if strictly necessary, her counsel e-mailed Defendant to ask whether it would be willing to depose her by video or Skype in light of her doctor's recommendation. See Opp., Exh. 3 (E-mail from Kathy Potter to David Jackson (Nov. 12, 2014, 10:21 AM)). The District never responded. See Opp. at 7. In fact, Defendant was "utter[ly] silen[t]" on the subject of the deposition until January 26, 2015, at which point it informed her attorney of its intention to seek dismissal of Counts III-V. See id. at 8.

The D.C. Circuit has cautioned that "'dismissal is a sanction of last resort to be applied only after less dire alternatives have been explored without success' or would obviously prove futile." Bonds, 93 F.3d at 808 (quoting Shea v. Donohoe Constr. Co., 795 F.2d 1071, 1075 (D.C. Cir. 1986)). Although it is certainly frustrated by the lack of progress, the Court does not believe that such a draconian measure is justified here. According to Plaintiff's account – and as corroborated by her evidentiary submissions – her counsel attempted to coordinate the deposition

prior to the November 24 deadline.  While Defendant's counsel claims he never received that communication, he does not assert that it was never sent.  That some technical or human error apparently prevented the e-mail from reaching its intended recipient does not undermine the fact that Elzeneiny, through her counsel, made good-faith efforts to comply with the Court's order.

To be sure, Plaintiff could have done more, such as following up with Defendant by phone or notifying the Court of her inability to make contact with opposing counsel.  But the District could also have stepped up its efforts, and, in any event, Elzeneiny's failure to chase down Defendant to arrange her own deposition does not warrant the harsh sanction of dismissal. While the Court is loath to extend this already-protracted litigation any further, it will deny the District's request without prejudice and will allow additional time for the parties to complete Plaintiff's deposition.  It will discuss the precise logistics of that deposition, as well as a briefing schedule for the District to renew this Motion, at a subsequent status hearing.

C. <u>Permissible Scope of Counts I and II</u>

Before reaching the merits of Plaintiff's claims under Counts I and II, the District raises two procedural hurdles to their viability.  It first argues that she cannot obtain relief under the DCHRA for conduct that occurred prior to March 10, 2008, because she elected to pursue administrative remedies for those acts.  It then asserts that she cannot seek relief under the ADA for certain conduct because she did not file a timely charge with the EEOC.  Agreeing on both fronts, the Court will address these issues in turn.

1. *DCHRA*

The DCHRA was enacted "to secure an end . . . to discrimination for any reason other than that of individual merit, including . . . discrimination by reason of . . . disability."  D.C. Code § 2-1401.01.  To aid its enforcement, the Act provides:

> Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of competent jurisdiction for damages and such other remedies as may be appropriate, <u>unless such person has filed a complaint [with the D.C. Office of Human Rights]</u>; provided, that where the Office has dismissed such complaint on the grounds of administrative convenience, or where the complainant has withdrawn a complaint, such person shall maintain all rights to bring suit as if no complaint had been filed.

<u>Id.</u> § 2-1403.16(a) (emphasis added). Individuals alleging violations of the DCHRA are thus offered two possible paths to redress: they may file a complaint either in court or with OHR. <u>See id.</u>; § 2-1403.03(b). In general, they cannot do both. <u>See</u> <u>Carter v. District of Columbia</u>, 980 A.2d 1217, 1223 (D.C. 2009) ("As we have explained, the jurisdiction of the court and OHR are mutually exclusive in the first instance. Thus, where one opts to file with OHR, he or she generally may not also file a complaint in court.") (internal quotation marks, alterations, and citations omitted). Indeed, once a plaintiff files a complaint with OHR, she may only file an independent suit in two narrow instances: if OHR dismissed the case on administrative convenience or if the individual withdrew her OHR complaint before a probable-cause determination was rendered. <u>See</u> <u>Jones v. District of Columbia</u>, 41 F. Supp. 3d 74, 79 (D.D.C. 2014) (citing <u>Anderson v. U.S. Safe Deposit Co.</u>, 552 A.2d 859, 861-63 (D.C. 1989)).

Contending that neither of these exceptions is applicable here, the District argues that Plaintiff cannot assert a DCHRA claim for acts prior to March 10, 2008, because she chose to seek relief for those acts through OHR's administrative channels. In support of its position, it notes that Elzeneiny filed a Charge of Discrimination with OHR on March 28, 2006, alleging discrimination from February 1, 2003, onwards. <u>See</u> Mot., Exh. 21 (March 28, 2006, EEOC Charge of Discrimination) at 1. OHR thereafter conducted an investigation and issued a Letter of Determination on October 31, 2007, in which it concluded that Plaintiff had failed to establish

probable cause to believe OBP had denied her reasonable accommodations, subjected her to harassment, or retaliated against her.  See Mot., Exh. 22 (OHR Letter of Determination) at 24. Elzeneiny applied for reconsideration, and on March 10, 2008, the Director of OHR upheld its earlier decision.  See Mot., Exh. 23 (OHR Reconsideration Determination).

Perhaps because it is so well established that aggrieved individuals must choose between filing a complaint with OHR or in a court of competent jurisdiction – subject only to the two aforementioned exceptions – Plaintiff does not contest this point in her Opposition.  And while the Court is somewhat skeptical that the relevant cut-off date is the date on which OHR affirmed its decision, as opposed to, say, the last date covered by the agency's investigation, Plaintiff has failed to respond to Defendant's argument on this front, effectively conceding the point.  See, e.g., Hopkins v. Women's Div., General Bd. of Global Ministries, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.") (citing FDIC v. Bender, 127 F.3d 58, 67-68 (D.C. Cir. 1997), and Stephenson v. Cox, 223 F. Supp. 2d 119, 121 (D.D.C. 2002)).  She, accordingly, cannot seek relief under the DCHRA for conduct that occurred before March 10, 2008.

2.  *ADA*

The District also questions the permissible scope of Plaintiff's ADA claim on the ground that she failed to exhaust her administrative remedies with the EEOC.  More specifically, it believes that she filed her first EEOC Charge of Discrimination too late to challenge many of the allegedly unlawful practices, and that her second EEOC Charge of Discrimination was too vague.  The Court will analyze these issues separately.

a.   Timeliness of First EEOC Charge

It is well established that "[b]efore bringing suit in federal court, ADA plaintiffs, like

those under Title VII, must exhaust their administrative remedies by filing an EEOC charge and

giving that agency a chance to act on it."  Marshall v. Fed. Exp. Corp., 130 F.3d 1095, 1098

(D.C. Cir. 1997) (citing 42 U.S.C. § 12117(a) and Park v. Howard Univ., 71 F.3d 904, 907-09

(D.C. Cir. 1995)); see also 42 U.S.C. § 12117 (incorporating procedural provisions of Title VII

for ADA causes of action); Mayers v. Laborers' Health & Safety Fund of North America, 478

F.3d 364, 368 (D.C. Cir. 2007) ("The ADA incorporates the procedural provisions of Title VII of

the Civil Rights Act of 1964 . . . .").  Such charge must be filed "within a specified period . . .

after the alleged unlawful employment practice occurred."  Hodge v. United Airlines, 666 F.

Supp. 2d 14, 20 (D.D.C. 2009) (quoting Ledbetter v. Goodyear Tire & Rubber Co., Inc., 550

U.S. 618, 623-24 (2007)).  Specifically, an aggrieved individual must file a charge within 180

days of the alleged discriminatory act, unless she has "instituted proceedings with a State or local

agency with authority to grant or seek relief from such practice," in which case she must file the

charge within 300 days.  See 42 U.S.C. § 2000e-5(e)(1).

The District concedes that Plaintiff had the benefit of the longer 300-day filing window.

See Mot. at 25.  It argues, however, that she did not file her first EEOC charge until March 28,

2006, and that much of the conduct of which she complains occurred more than 300 days before

that date – i.e., prior to June 1, 2005.  Such acts, it continues, are thus not properly before this

Court.

In response, Elzeneiny asserts that there is a genuine dispute of material fact as to the

date on which she filed her initial EEOC charge.  She insists that she filed it on December 19,

2005.  She also argues that the Court can and should consider conduct that occurred outside of

23

the 300-day window – *i.e.*, before February 22, 2005 – because she has alleged <u>continuing</u>

<u>violations</u> of the ADA.  In such instances, she argues, all that matters is that she filed the charge

within 300 days of <u>any</u> of the discriminatory, harassing, or retaliatory acts.

      As to the first point, the Court agrees that there is a genuine dispute of material fact

regarding the date on which Elzeneiny filed her first EEOC charge.  For its part, the District has

submitted a Charge of Discrimination dated March 28, 2006.  <u>See</u> March 28, 2006, EEOC

Charge of Discrimination.  It has also provided excerpts from Plaintiff's deposition in which, it

claims, she admitted that the March 2006 charge was the first that she filed.  <u>See</u> Elzeneiny

Depo. at 144:18-145:4.  The testimony, however, is not as clear as Defendant suggests.  Plaintiff

has, moreover, submitted what appears to be a Charge of Discrimination dated December 19,

2005, <u>see</u> December 19, 2005, EEOC Charge of Discrimination, as well as a sworn declaration

stating that she filed an Affidavit and Charge of Discrimination with OHR on December 19,

2005, which was cross-filed with the EEOC.  <u>See</u> Elzeneiny Decl., ¶ 7.  Because the Court

cannot now resolve this factual dispute, it assumes that Plaintiff is right – *i.e.*, that she filed on

the earlier date and that February 22, 2005, is the relevant cut-off for determining which acts are

time barred.

      As to Plaintiff's second point, she is correct that "if the alleged acts constitute one similar

pattern or practice and at least one illegal act took place within the filing period, then the

complaint of discrimination is not time-barred and acts outside the statutory period may be

considered for purposes of liability."  <u>Mayers</u>, 478 F.3d at 368 (internal quotation marks and

citation omitted).  The D.C. Circuit has pointed out, however, that the continuing-violations

doctrine "has two crucial limiting principles, . . . both derived from the Supreme Court's ruling

in <u>National Railroad Passenger Corp. v. Morgan</u>, 536 U.S. 101 (2002).  The first is that "the

doctrine has no applicability to discrete acts such as termination, failure to promote, denial or

transfer, or refusal to hire because each incident of discrimination and each retaliatory adverse

employment action constitutes a separate actionable unlawful employment practice." Mayers,

478 F.3d at 368 (quoting Morgan, 536 U.S. at 114) (internal quotation marks and alterations

omitted). "[D]iscrete discriminatory acts are," therefore, "not actionable if time barred, even

when they are related to acts alleged in timely filed charges." Morgan, 536 U.S. at 113

(emphasis added). The second limiting principle is that "although plaintiffs may invoke the

continuing violations doctrine for claims that by their nature occur not 'on any particular day'

but 'over a series of days or perhaps years,'" – *i.e.*, hostile-environment claims – "they must

allege that at least one 'act contributing to the claim occur[red] within the filing period.'"

Mayers, 478 F.3d at 368 (quoting Morgan, 536 U.S. at 115).

The first Morgan principle disposes of many of the alleged discriminatory and retaliatory

acts that Plaintiff seeks to challenge here. For instance, to the extent the District failed to

provide her with reasonable accommodations in a timely manner, each such failure constituted a

discrete act of discrimination that ended, at the very latest, on the day that the relevant

accommodation was provided. See id. at 368-69 ("[Defendant's] failure to provide the electric

tools was a discrete act of discrimination that ended, at the latest, in June 2000 when [it]

provided the requested equipment – well outside the 180-day period leading up to [Plaintiff's]

EEOC complaint."). Plaintiff is thus barred from challenging any potential failure of the District

to timely provide: 1) handicap access to the Wilson Building, which was granted in December

2003; 2) an ergonomic chair, which was provided in November 2003, see May 7, 2004, Bryant

Memo at 1; 3) a desktop printer, which was provided sometime before May 2004, see id. at 2; 4)

a laptop computer to use at home, which was provided in 2004, see id.; 5) a flexible arrival time,

which was approved in November 2003, see id. at 2-3; 6) permission to stay in her cubicle,

which it formally provided in February 2004, see February 26, 2004, Bryant Memo at 2; and 7)

approval to use taxi cabs for work-related travel, which was granted in February 2004.  See id.

To the extent the District retaliated against her for exercising her rights under the ADA,

each adverse action was also a discrete act subject to the 300-day filing period.  See Morgan, 536

U.S. at 114 ("Each incident of discrimination and each retaliatory adverse employment decision

constitutes a separate actionable 'unlawful employment practice.'"); see also, e.g., Dickens v.

Dep't of Consumer & Regulatory Affairs, 298 F. App'x 2, 3 (D.C. Cir. 2008) (unpublished)

(noting that Morgan "establishes that for statute-of-limitations purposes there are only two kinds

of Title VII violations: 'discrete acts' and 'hostile work environments'").  Any retaliatory actions

taken before February 22, 2005, were thus not timely challenged before the EEOC and cannot be

pursued here.

Plaintiff is right, however, to point out that "[h]ostile environment claims are different in

kind from discrete acts."  Morgan, 536 U.S. at 115.  As the Supreme Court explained in Morgan,

such a claim "is composed of a series of separate acts that collectively constitute one 'unlawful

employment practice.'"  Id. at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)).  Thus, as long as "an act

contributing to the claim occurs within the filing period, the entire time period of the hostile

environment may be considered by a court for the purposes of determining liability."  Id.  Yet

courts evaluating the timeliness of hostile-work-environment claims must bear in mind that

> [b]oth incidents barred by the statute of limitations and ones not
> barred can qualify as "part of the same actionable hostile
> environment claim" only if they are adequately linked into a
> coherent hostile environment claim – if, for example, they
> "involve[] the same type of employment actions, occur[] relatively
> frequently, and [are] perpetrated by the same managers."

Baird v. Gotbaum (Baird I), 662 F.3d 1246, 1251 (D.C. Cir. 2011) (alterations in original)

(quoting Morgan, 536 U.S. at 120-21).  The timeliness of Elzeneiny's EEOC charge thus

depends on whether at least one of the acts comprising a hostile work environment took place

after February 22, 2005.  Without yet delving into whether the acts she complains of are

sufficiently related and severe, the Court notes that at least some of the conduct she says was part

of a hostile work environment occurred after February 22, 2005.  See December 19, 2005, EEOC

Charge (averring that in June 2005, her "midyear evaluation for FY 2005 reflected many

accusations which have not been substantiated").  The Court, accordingly, will not dismiss the

hostile-work-environment claim on timeliness grounds.

### b.  Adequacy of Second EEOC Charge

Although its argument is rather hazy, the District also contests the adequacy of Plaintiff's

second EEOC Charge.  See Mot. at 27.  It asserts that the Charge, which alleged disability

discrimination and retaliation beginning on April 3, 2008, did not "identify a single discrete act

of discrimination or retaliation."  Id.  It also notes that "Plaintiff d[id] not . . . identify any hostile

act committed by any supervisor or by any other person."  Id.

As discussed above, exhaustion is a prerequisite to bringing suit under the ADA.  And

"[a] vague or circumscribed EEOC charge will not satisfy the exhaustion requirement for claims

it does not fairly embrace."  Marshall, 130 F.3d at 1098.  This is so because "[a]llowing a

complaint to encompass allegations outside the ambit of the predicate EEOC charge would

circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party

of notice of the charge, as surely as would an initial failure to file a timely EEOC charge."  Id.

(quoting Schnellbaecher v. Baskin Clothing Co., 887 F.2d 124, 127 (7th Cir. 1989)) (internal

quotation marks omitted).  At the same time, "every detail of the eventual complaint need not be

presaged in the EEOC filing."  Id.  Rather, "the substance of an ADA claim, like that of a Title

VII claim, must fall within the scope of 'the administrative investigation that can reasonably be

expected to follow the charge of discrimination.'"  Id. (quoting Park, 71 F.3d at 907)).

Here, Plaintiff's second EEOC Charge stated:

> On March 10, 2008 the DC Office of Human Rights ruled . . . that
> the Office of Budget & Planning had accommodated me.  Shortly
> after the ruling by DCOHR, the previously granted reasonable
> accommodations for my disability were removed.  I continue to
> need the flexibility to work at home, and to have flexible work
> hours.  I have also been retaliated against for having filed the
> complaint with DCOHR and for filing a complaint with the DC
> Office of Disability Rights in my quest for reasonable
> accommodation.

Mot., Exh. 24 (EEOC Charge of Discrimination, March 9, 2009).  Although Defendant seems to

contend that this did not clearly articulate any claim, it plainly "embrace[d]" her contention that

she was discriminated and retaliated against when, in April 2008, the District revoked the

accommodations it had previously provided to her.  To the extent Defendant's argument is that

she should have identified every specific accommodation that was withdrawn, it is mistaken.

The EEOC's investigation would surely have looked into this and the District would certainly

have known which accommodations it had previously provided and thus which accommodations

were alleged to have been taken away.  This Charge did not, however, encompass any potential

claim of discrimination she may have had for the District's failure to promptly provide speech-

recognition software in 2006 or VPN access in 2007.  See Marshall, 130 F.3d at 1098 (plaintiff

failed to exhaust where EEOC charge "ma[de] no mention of any refusal to accommodate her

lifting limitations or even of her termination").

The Court questions whether other claims – such as for the denial of her request to work

from home without limitation and for delays in providing filing cabinets in 2010 – have been

properly exhausted.  Neither party has submitted an EEOC Charge evidencing such.  Yet because the District has not raised that argument, the Court will not dismiss them on this basis.

Now having defined the proper, albeit substantially limited, scope of Counts I and II, the Court may proceed to the merits of what remains.  This, the city correctly contends, is very little.

D.  Merits of Counts I and II

In attacking Elzeneiny's extant allegations, the District insists that it acted in good faith and provided her with "just about every accommodat[ion] she requested." Mot. at 29-30.  It also contends that the alleged harassment did not rise to the level of a hostile work environment, and that Plaintiff cannot show that she was constructively discharged or otherwise retaliated against. The Court will address these arguments in turn.

In doing so, it analyzes her claims under the ADA and DCHRA simultaneously, as the standards under both are sufficiently similar under the circumstances to dispense with independent analysis.  See, e.g., Hunt v. District of Columbia, 66 A.3d 987, 990 (D.C. 2013) ("Our decisions under the DCHRA regarding whether an employee was discriminated against because of a 'disability' effectively incorporate judicial construction of related anti-discrimination provisions of the Americans with Disabilities Act."); Giles v. Transit Employees Fed. Credit Union, No. 14-7055, 2015 WL 4217787, at *2 (D.C. Cir. July 14, 2015) ("When evaluating claims brought under the DCHRA, decisions construing the ADA are considered persuasive.") (internal quotation marks, citations, and alterations omitted).  For ease of analysis – and because Defendant is not prejudiced – the Court also applies the broader ADA window (for violations after February 22, 2005), as opposed to the narrower DCHRA one (anything after March 10, 2008).

1.   *Failure to Provide Reasonable Accommodations*

To make out a failure-to-accommodate claim under the ADA, Elzeneiny must show that: (1) she was disabled within the meaning of the ADA; (2) the District was aware of her disability; (3) she could have done her job with reasonable accommodations; and (4) she was denied such accommodations.  See 42 U.S.C. § 12112(a), (b)(5)(A); Carr v. Reno, 23 F.3d 525, 529 (D.C. Cir. 1994).  The District concedes, for purposes of its Motion, that Plaintiff had a disability and that it was aware of this disability.  See Mot. at 28-29.  It states that "Plaintiff cannot, however, establish the third and fourth elements."  Id. at 29.

In her declaration and brief, Plaintiff acknowledges that she "was provided with many of the[] accommodations" that she requested.  See Elzeneiny Decl., ¶ 5; Opp. at 11.  Her principal complaint is that "it was months before [she] received many" of them, "and in the case of VPN [access], it took three years."  Elzeneiny Decl., ¶ 5.

The D.C. Circuit has suggested that "there are certainly circumstances in which a 'long-delayed accommodation could be considered' unreasonable and hence 'actionable under the ADA.'"  Mogenhan v. Napolitano, 613 F. 3d 1162, 1167-68 (D.C. Cir. 2010) (quoting Mayers, 478 F.3d at 368).  Other circuits and courts have likewise recognized that, at some point, a delay in providing an accommodation could constitute an ADA violation.  See Selenke v. Med. Imaging of Colo., 248 F.3d 1249, 1262 (10th Cir. 2001) (citing cases in which courts concluded that delays in providing reasonable accommodations could violate ADA); Jay v. Intermet Wagner Inc., 233 F.3d 1014, 1017 (7th Cir. 2000) (noting that "unreasonable delay in providing an accommodation can provide evidence of discrimination"); Pantazes v. Jackson, 366 F. Supp. 2d 57, 70 (D.D.C. 2005); Leiterman v. Johnson, 60 F. Supp. 3d 166, 181 (D.D.C. 2014) (declining to grant defendant summary judgment on ground that plaintiff ultimately got

requested accommodation, in light of three-year delay).  Such courts have identified factors to

aid in determining whether a delay was reasonable or unreasonable, including "the length of the

delay, the reasons for the delay, whether the employer has offered any alternative

accommodations while evaluating a particular request, and whether the employer has acted in

good faith."  Selenke, 248 F.3d at 1262-63.  The acceptable timetable thus varies depending on

the nature of the request and the circumstances of each case.

      As discussed previously, many of the delays with which Plaintiff takes issue are not

subject to challenge because she did not file a related EEOC Charge in time and because she

elected to pursue administrative remedies through OHR.  Indeed, the only potential "delay" that

remains is the promptness with which the Office approved Plaintiff's request to use empty filing

cabinets in 2010.

      On this claim, however, Plaintiff does not point to any evidence establishing specific

facts about this delay, such as when she first made the request or the length of time before it was

approved.  Indeed, all that she has cited on this claim is her own declaration, in which she states

in very general terms that she requested a variety of accommodations and that, while "many" of

these were provided, "it was months before [she] received many of the[m]."  Elzeneiny Decl., ¶¶

4-5.  This is obviously insufficient evidence to go to a jury, particularly where the Court remains

uncertain why such filing cabinets were necessary.

      That leaves two remaining accommodations issues.  The first is whether the District

improperly revoked certain accommodations in 2008.  On this front, Plaintiff has averred that

"[s]hortly after the March 10, 2008, [OHR] Determination was issued, Defendant removed all of

[her] accommodations until March 2009 . . . ."  Elzeneiny Decl., ¶ 9.  The District also concedes

that "there was a brief discontinuation of flextime and work from home accommodations in late

2007 or early 2008 . . . ."  Mot. at 31 (citing Chaudhuri Decl., ¶¶ 3-6).  It states in its Motion that

these were reinstated on April 3, 2008, though the supporting declaration suggests that certain

accommodations were not.  See Chaudhuri Decl., ¶ 4 (noting that in April 2008, OBP "notified

Ms. Elzeneiny that it was terminating the temporary authorization to sign-in on a liberal, non-

predetermined basis").  As Plaintiff contends that some accommodations were rescinded and

Defendant has not clearly articulated why, the Court cannot conclude as a matter of law that this

suspension in accommodations was justifiable.

The second issue is whether the District improperly refused to follow the

recommendation of Plaintiff's doctors when she returned from FMLA leave in August 2009.  In

her Opposition, Plaintiff stresses that Dr. Mustafa had "recommended that she be able to work

from home on a flexible schedule with the aid of a laptop computer on an as needed basis."  Opp.

at 12.  She also notes that Dr. Wilson recommended the same.  Id. at 12.  "Yet, Defendant put

conditions on the accommodations" – such as having to complete her work within certain hours

– "that were not in keeping with what her doctors had recommended."  Id.

The District has, however, provided undisputed evidence that granting these August 2009

accommodations requested by her doctors would have caused an undue burden.  Specifically, it

has stated that allowing Plaintiff "to work from home without prior notice for an indefinite time

period" would have "result[ed] in the elimination of 30% of her job responsibilities, placing an

undue burden on her managers and colleagues who would have to perform her work instead."

Chaudhuri Decl., ¶ 5.  It has also explained that at the time of Plaintiff's request in August 2009,

OBP was handling additional work and stress as a result of having to rewrite the budget that

year.  Because Elzeneiny's work required that she "speak to agency finance staff, managers, and

budget book production staff, . . . [the Office] did not authorize work for credit at 5:00 a.m. or

10:00 p.m. as suggested in Dr. Mustafa's statement."  Spaulding Decl., ¶ 6.  Plaintiff does not

offer any retort.  The Court, accordingly, finds that she has failed to create a dispute of fact as to

whether these August 2009 accommodations would have caused Defendant an undue burden.

### 2. *Hostile Work Environment*

The District next argues that Plaintiff cannot establish that she was subjected to a hostile

work environment.  See Mot. at 35.  In doing so, it does not contest that the ADA provides a

cause of action for hostile work environments.  While this Circuit does not appear to have

explicitly recognized such a claim under the ADA, the Court presumes that it would.  See, e.g.,

Pantazes, 366 F. Supp. 2d at 70-71 (denying employer summary judgment on hostile-work-

environment claim under Rehabilitation Act); Henry v. Guest Servs., Inc., 902 F. Supp. 245, 252

n.9 (D.D.C. 1995) (holding that harassment standard from Title VII applies to harassment claims

under ADA); see also Lanman v. Johnson County, Kansas, 393 F.3d 1151, 1155 (10th Cir. 2004)

(holding such claims are actionable under the ADA); Shaver v. Independent Stave Co., 350 F.3d

716, 719 (8th Cir. 2003) (same); Fox v. General Motors Corp., 247 F.3d 169, 176 (4th Cir. 2001)

(same); Flowers v. Southern Regional Physician Servs., Inc., 247 F.3d 229, 232 (5th Cir. 2001)

(same).

The District focuses its challenge, instead, on whether the purported conduct rises to the

level of a hostile work environment.  See Mot. at 34-35.  Case law teaches that plaintiffs face a

high bar when bringing such claims.  To prevail, they must establish that they were subjected to

"'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter

the conditions of [their] employment and create an abusive working environment.'"  Baloch v.

Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting Harris v. Forklift Sys., Inc., 510

U.S. 17, 21 (1993)).  Courts evaluating such claims look to "the totality of the circumstances,

including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance."  Id. (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)).

As is consistent with the rest of Plaintiff's Opposition, the section of her brief addressing Defendant's arguments on this claim offers little in the way of factual or legal analysis.  After stating the general law on hostile-work-environment claims, she asserts only that "'[v]ery rarely will such fact-based determinations be appropriate for determination on summary judgment,'" Opp. at 13 (quoting Armstrong v. Reno, 172 F. Supp. 2d 11, 24 (D.D.C. 2001)), and that "facially neutral incidents may . . . be considered as part of the totality of the circumstances supporting a plaintiff's hostile work environment claim if a trier of fact could reasonably conclude that they were, in fact, based on the plaintiff's protected status."  Id. (quoting Mason v. Geithner, 811 F. Supp. 2d 128, 180 (D.D.C. 2011)) (internal quotation marks, citations, and alterations omitted).  She does not even bother to describe the acts she contends were part of a hostile work environment.  Rather, she merely cites to a single paragraph from her declaration as evidence of such claim.

In that paragraph, Elzeneiny avers:

    a. The Branch Chief for Administration hand-delivered a letter to my physician in an attempt to communicate with him about my disability without my permission;
    b. I was accused of wrongdoing where there was no evidence of wrongdoing;
    c. I was denied proper performance evaluations;
    d. After being promoted, the paperwork to implement the promotion was not submitted or acted on for over eight months;
    e. My supervisor constantly interfered with my ability to work;
    f. My supervisor rummaged through my personal belongings;
    g. My accommodation requests were repeatedly delayed;
    h. I was granted FMLA leave and then sent a letter while on FMLA leave denying the leave;

i. As the hostile work environment intensified, I was presented with a Performance Improvement Plan ("PIP") giving me only 8 days to improve at a time when I was experiencing significant health problems that resulted in my doctor recommending that I go on FMLA leave;

j. I was terminated while on FMLA leave without explanation;

k. After winning an appeal of my termination, I was reinstated on April 27, 2011, and placed on FMLA leave effective March 9, 2011, even though I had been ready and able to return to work for some time and had not requested to continue to be on FMLA leave;

l. Upon returning back to work, I was not reinstated in my prior position or a similar position. I was reassigned to a position in ERDC and was essentially given no work to do. What little work I was given involved data entry or copying;

m. The position to which I was reassigned had no chance of career advancement in my field because I was no longer performing the budget analyst duties I had been performing.

Elzeneiny Decl., ¶ 11.

Her EEOC Charge adds some meat to these bones, though only a little. For instance, presumably referring to the incident mentioned in (a) above, it stated that in November 2003, "Respondent . . . hand delivered a letter directly to my physician, inquiring about my condition without my approval . . . ." December 19, 2005, EEOC Charge. Seemingly in reference to (c) above, she stated, "I have been treated differently from my co-workers in that my commendations from the agencies are not included in my evaluations . . . ," and, "in my FY 2004 Evaluation, Respondent admonished me for a time extension for a project, which had been approved for another co-worker, but not mentioned as a negative in their evaluations." Id. A handful of additional acts of "harassment" are also mentioned in the EEOC Charge, such as the District's "insisting that [she] move to another cubicle in December 2003"; Ayers's "standing over [her] while [she] was talking on the phone to [her] ph[y]sician"; the Office's including "negative comments . . . about [her] work in the passback folders which are openly seen by the whole office"; and supervisors "not be[ing] discrete [*sic*] about [her] condition." Id.

Considered together, this grab bag of vaguely referenced incidents is not enough to defeat summary judgment. For one thing, many of these statements are both too conclusory and too nebulous. She does not offer any specific evidence or facts to demonstrate, for instance, how her performance evaluations were improper, how her supervisor "constantly interfered" with her work, or how her supervisor "rummaged" through her personal belongings. She similarly provides no evidence regarding the frequency of such conduct or its severity. See Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999) ("Although, as a rule, statements made by the party opposing a motion for summary judgment must be accepted as true for the purpose of ruling on that motion, some statements are so conclusory as to come within an exception to that rule."); see also Holmes-Martin v. Sebelius, 693 F. Supp. 2d 141, 161 (D.D.C. 2010); Ware v. Hyatt Corp., No. 12-395, 2015 WL 739857, at *8 (D.D.C. Feb. 23, 2015) ("[R]egarding the name-calling, plaintiff does not attempt to date or quantify his general allegations that Olson called him 'old man' 'frequently' or 'a lot of times,'" and "[i]t is plaintiff's duty, in opposing summary judgment, to establish more than '[t]he mere existence of a scintilla of evidence in support' of his position.") (quoting Anderson, 477 U.S. at 252).

For another, while the connection between her disability status and some of these acts is clear – such as her Branch Chief's attempting to communicate directly with her doctor – she does not bother to tie much of this conduct to her disabled status. She offers no evidence, for example, that her supervisor rummaged through her things, did not include commendations in her evaluations, or made unsubstantiated allegations of wrongdoing because of her protected status. See, e.g., Hussain v. Gutierrez, 593 F. Supp. 2d 1, 7 (D.C. Cir. 2008) ("Hussain fails to demonstrate that Rundell's yelling and screaming at her was based on her status as a member of a protected class."); Badibanga v. Howard Univ. Hosp., 679 F. Supp. 2d 99, 104 (D.D.C. 2010)

("[T]he allegations that are unrelated to Mr. Badibanga's race/ethnicity, such as his allegations that he was disciplined when others were not and that he was falsely accused of being rude, cannot support a claim for hostile work environment."); Kelley v. Billington, 370 F. Supp. 2d 151, 158 (D.D.C. 2005) (same).

She has failed, moreover, to demonstrate an adequate connection between these various incidents.  See Baird I, 662 F.3d at 1251 (acts must be "adequately linked into a coherent hostile environment claim").  She has not stated who was involved, how frequently these incidents occurred, or how close in time they were.  See id. (noting that incidents might be sufficiently related "if, for example, they 'involve[] the same type of employment actions, occur[] relatively frequently, and [are] perpetrated by the same managers'") (quoting Morgan, 536 U.S. at 120-21); Baird v. Gotbaum (Baird II), No. 12-5334, 2015 WL 4079546, at *4 (D.C. Cir. July 7, 2015) (finding plaintiff failed to allege hostile work environment where "[t]he intermittent spats identified in [her] complaints . . . – spanning eight years and involving different people doing different things in different contexts – have little to do with each other," and plaintiff had "ma[de] no serious attempt to tie them together").

The Court concludes as a matter of law that these largely isolated incidents over the course of eight years do not amount to an abusive working environment.  See Hussain v. Nicholson, 435 F.3d 359, 366-67 (D.C. Cir. 2006) (plaintiff must show that employer "subjected [her] to 'discriminatory intimidation, ridicule, and insult' of such 'sever[ity] or pervasive[ness] [as] to alter the conditions of [her] employment and create an abusive working environment'") (quoting Harris, 510 U.S. at 21-22) (some alterations in original); see also Daka, Inc. v. Breiner, 711 A.2d 86, 93 (D.C. 1998) ("More than a few isolated incidents must have occurred, and genuinely trivial occurrences will not establish a prima facie case.") (citation omitted).

3.  *Constructive Discharge*

Defendant also argues that Plaintiff has not produced evidence sufficient for a jury to conclude that she was constructively discharged from her position.  It notes that "[r]esignations or retirements are presumed to be voluntary."  Aliotta v. Bair, 614 F.3d 556, 566 (D.C. Cir. 2010) (citation and internal quotation marks omitted).  "In certain cases," however, "the doctrine of constructive discharge enables an employee to overcome the presumption of voluntariness and demonstrate she suffered an adverse employment action by showing the resignation or retirement was, in fact, not voluntary."  Id.  To do so, a plaintiff must show that "a reasonable person in the employee's position would have felt compelled to resign under the circumstances."  Id. (citation omitted).

In her Opposition, Plaintiff contends that she was effectively forced to resign because, after her reinstatement in April 2011, "she was moved to a different position with no job responsibilities, mostly doing data entry and copying, with no chance for career advancement in her field."  Opp. at 13 (citing Elzeneiny Decl., ¶ 11(*l*)-(m)).  She relies on a D.C. Court of Appeals holding that a constructive-discharge claim may lie where discriminatory actions have "essentially locked [the employee] into a position that did not allow for career advancement."  Opp. at 13-14 (quoting Williams v. Johnson, 776 F.3d 865, 872 (D.C. Cir. 2015) (quoting Arthur Young & Co. v. Sutherland, 631 A.2d 354, 362-63 (D.C. 1993)) (internal quotation marks omitted).

Defendant urges in its Reply that Plaintiff should not be allowed to rely on attestations in her declaration about these later events because it has not yet had an opportunity to depose her about them and she is thus attempting to gain an unfair advantage.  This point is well taken.  It is,

nonetheless, an immaterial concern because even if the Court were to accept the averments in her

declaration, she has failed to provide sufficient evidence to proceed on this claim.

It is true that, in extreme cases, a reduction in job responsibilities or limitations imposed

on career advancement could amount to a constructive discharge.  In Clark v. Marsh, 665 F.2d

1168, 1174 (D.C. Cir. 1981), for instance, this circuit found sufficient evidence of a constructive

discharge where the "plaintiff had been actively seeking advancement . . . for eleven years" at

the time she was denied a final promotion; she "had been continuously spurned" for

advancement opportunities, "[d]espite an outstanding employment record,"; "her informal efforts

to obtain relief were largely ignored"; and her "formal administrative charges, filed three years

previously, had similarly failed to produce corrective action."  Id. at 1174.  Because the plaintiff

"was thus essentially locked into a position from which she could apparently obtain no relief,"

the Court found her early retirement involuntary.  Id.

In Williams v. Johnson, 776 F.3d 865 (D.C. Cir. 2015), a case brought under the D.C.

Whistleblower Protection Act, there was adequate evidence of constructive discharge where,

"[d]espite [the plaintiff's] request, none of the job responsibilities her former supervisors had

taken away from her was ever restored."  Id. at 872.  "[I]ndeed, her new supervisor eliminated

her position and, although Williams was nominally put in a new position, her new supervisor had

not found any work for Williams to do in more than five months of asking.  In other words,

Williams presented evidence that the damage her harassing supervisors had done had a lasting

effect and that she was essentially unable to work, let alone advance, in her job."  Id.

A common thread in these prior cases is that the employees made considerable attempts

to remedy the situation through formal and informal means, but to no avail, and it had thus

become clear that their circumstances would not change.  Here, however, Plaintiff has failed to

show that she was "essentially locked into a position from which she could apparently obtain no relief." Clark, 665 F.2d at 1174.  She does not assert, for instance, that she discussed the reduced job responsibilities with anyone after her transfer.  As courts have explained, because "society and the policies underlying Title VII will be best served if, wherever possible, unlawful discrimination is attacked within the context of existing employment relationships," employees are generally expected to stay at their jobs instead of resigning.  See id. at 1173 (internal quotation marks and citation omitted).  The same is true of the ADA.  Absent any attempt on the part of Plaintiff to resolve her concerns about her reduced job responsibilities, the situation had not become so clearly permanent that resignation was a fitting response.

4.    *Retaliation*

Although Counts IV and V are specifically labeled as "Retaliation" counts, Plaintiff also does cursorily mention retaliation in Counts I and II.  See Sec. Am. Compl., ¶¶ 29, 32.  As discussed previously, however, most of the purportedly retaliatory acts are not properly before this Court because Elzeneiny opted to pursue them through OHR and did not file a timely EEOC Charge incorporating them.  In contesting summary judgment, the only other acts she raises are Defendant's creation of a hostile work environment and its constructive discharge.  As the Court has just granted the District summary judgment on those, it must also grant summary judgment as to the retaliation component of Counts I-II.

\*      \*      \*

In sum, the Court will not throw out Plaintiff's later-added causes of action (Counts III-V), but will instead allow her one more chance to appear for a deposition.  As for Counts I-II, the Court holds that Defendant's Motion is granted almost entirely, with the exception of the removal and discontinuation of certain accommodations, as discussed in Part III.D.1, *supra*.

IV.     **Conclusion**

For the foregoing reasons, the Court will grant in part and deny in part Defendant's

Motion for Summary Judgment.   A contemporaneous Order will so state.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  August 19, 2015