**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMINA ELZENEINY, | |
| **Plaintiff,** | |
| v. | Civil Action No. 09-889 (JEB) |
| DISTRICT OF COLUMBIA, | |
| **Defendant.** | |

## MEMORANDUM OPINION

In his epic, multi-generational saga 100 Years of Solitude, Gabriel García Márquez reflected that "it is easier to start a war than to end it."  In similar fashion, Plaintiff Amina Elzeneiny's thirteen-year-long employment-discrimination battle with the District of Columbia was far easier to initiate than it has been to resolve.  Elzeneiny was first hired as a Budget Analyst in the District's Office of the Chief Financial Officer, a unit of the Office of Budget and Planning, in January 2003.  Several months later, she sought workplace accommodations on account of her suffering from fibromyalgia, a condition that causes muscle and joint pain and chronic fatigue.  Dissatisfied with the city's response, Elzeneiny filed her first charge of discrimination related to the District's failure to accommodate her disability in 2005, eleven years ago.  The parties' ongoing skirmishes concerning her requests for accommodations wended their way through the administrative process for years before she resorted to filing this suit in 2009, by which time Elzeneiny also had grievances against Defendant related to her recurring requests to take time off under the Family and Medical Leave Act.  Plaintiff's original suit contained an admixture of failure-to-accommodate, hostile-work-environment, Title VII, and

retaliation claims, many of which the District has plucked away over many years through successful motions practice.

Of particular note, in August of last year, the Court resolved Elzeneiny's grievances concerning events that took place between 2003 and 2010, dismissing nearly all of the relevant counts as to this time period.  See Elzeneiny v. District of Columbia, 125 F. Supp. 3d 18 (D.D.C. 2015) (Elzeneiny II).  Because the parties had been unable to schedule a deposition from Elzeneiny to testify about events that took place in 2011 – her final year of employment – the Court could not address all of Plaintiff's outstanding charges at that time.  Having since secured said deposition, the District has now moved for summary judgment on Plaintiff's three remaining counts – one each of interference and retaliation under the FMLA, and a count of retaliation in violation of the Americans with Disabilities Act.  Matching Márquez's epic saga in its complexity but certainly not in its profundity, this lawsuit's loose ends are finally ready for resolution.  And just as with the members of Márquez's Buendía family, some of Defendant's arguments meet with success, while others are destined to a losing fate.

## I.      Background

### A.  Factual Background

Because much of this case's factual background was recited at length in the prior summary-judgment Opinion, see Elzeneiny II, 125 F. Supp. 3d 18, the Court will only briefly sketch out the broad history of the case before homing in on the 2011 events at issue in the current Motion.

Plaintiff began work at the District's Office of Budget Policy as a Budget Analyst in January of 2003 and shortly afterwards informed her superiors that she suffered from fibromyalgia.  Id. at 22-23.  What transpired next was a long and complicated series of efforts by

Plaintiff to secure workplace accommodations related to her condition.  Such negotiations took place on and off from shortly after she was hired up to the point at which she ultimately resigned in November 2011, almost nine years later.  Id. at 23-27.  Her tenure with OBP was also punctuated by unsuccessful charges of discrimination that she filed with the Equal Employment Opportunity Commission and the D.C. Office of Human Rights, in which she alleged that OBP supervisors had failed to accommodate her requests, id. at 24, and also that she had been retaliated against both on account of her disability and also for seeking leave under the Family and Medical Leave Act.  Id. at 25-30.

The events surrounding her March 2011 attempt to take FMLA leave – and the conditions under which she returned from that leave – are at the heart of Defendant's second Motion for Summary Judgment, considered here.  A book-jacket summary of the plot: Defendants assert that there were ongoing problems with Plaintiff's work performance and output as a budget-administration analyst.  This issue came to a head when the District issued a written reprimand criticizing her low productivity.  Perhaps coincidentally, the next day she requested to take FMLA leave.  The District denied this request and, when she took FMLA leave anyway, it later provided her with a notice of termination.  She appealed the termination, which was subsequently reversed; she was then reinstated and retroactively approved to take FMLA leave. Upon returning to work in May 2011, however, Elzeneiny was reassigned to a new position, and in the following months she and various District supervisors engaged in the now-familiar back-and-forth concerning her workplace accommodations, culminating in her resignation in November 2011.

Three main grievances emerge from this timeline: 1) Defendant interfered with Elzeneiny's right to take FMLA leave in March of 2011 and her right to return promptly from

that leave; 2) it retaliated against her upon her return by putting her in a new position with fewer responsibilities and inferior tasks; and 3) it also retaliated by refusing to provide her with necessary accommodations for her disability when she returned from that leave in May 2011. Given the panoply of relevant events, for simplicity's sake the Court will eschew time travel and proceed in chronological order. The first three sections below map onto the first claim, while the fourth and fifth correspond respectively to her second and third claims.

    1. *March 2011 Reprimand*

This chapter in Plaintiff's story begins on March 8, 2011, when Elzeneiny's supervisor, Eric Cannady, "issued a written reprimand criticizing Plaintiff's lack of work production." MSJ at 2. The District claims that Cannady's concerns were the culmination of months of documented frustration with Elzeneiny's unsatisfactory job performance. As the Director for Budget Administration in D.C.'s Office of the Chief Financial Officer (OCFO), a unit of the OBP, Cannady supports the Mayor and City Council in developing, implementing, and overseeing the District's $12.7 billion operating budget. See Declaration of Eric Cannady I (ECF No. 75-4), ¶¶ 1-2. Cannady supervised Elzeneiny in her capacity as a senior budget-administration analyst between January and March of 2011. Id. at 2. Her duties included providing analyses of proposed budgets, developing "informed guidance needed for OBP programs divisions, branches, and District agencies to make proper budgetary formulation, execution, and planning decisions," and "ensur[ing] that budget formulation milestones are met on schedule." Elzeneiny Deposition Exhibits (ECF No. 88-2), Exh. 9 (Position Description, Budget Administration Analyst) at 1-2.

In his written reprimand of March 8, 2011, Cannady pointed to the fact that he had already "had to reduce [Elzeneiny's] workload from managing eight agency budgets to

four . . . [,] [which was] the direct result of [her] inability to perform at the level expected of a

Budget Administration Analyst."  Elzeneiny Dep. Exhibits, Exh. 5 (Reprimand of Amina

Elzeneiny).  Yet it still "took [her] 'almost four hours to make very minor edits to an agency

budget chapter," and in his observation of her work habits, she took "too long to complete very

simple tasks" and "spen[t] too much time socializing with other OBP staff when [she] should be

focused on completing" her work.  Id.   In a subsequent confidential memorandum, Gordon

McDonald, Deputy Chief Financial Officer for the OBP, summarized Elzeneiny's ongoing

deficiencies in the months prior to Cannady's written reprimand, which included her failure to

understand the expectations of her role, an inability to complete simple tasks, and a level of

knowledge concerning the District's "financial system of record" that was far below what would

be expected of an analyst who had worked for OBP for nearly eight years.  See Declaration of

LaSharn Moreland I (ECF No. 75-23), Exh. 3 (Recommendation to Terminate Employment of

Ms. Amina Elzeneiny) at 2.  Cannady also had concerns that Elzeneiny was not actually working

the hours she submitted on her timesheets: many of her days were spent working from home due

to her fibromyalgia accommodations, but he felt her productivity was implausibly low if she

were actually working the hours she claimed.  Id.  To support Elzeneiny in making

improvements, Cannady notified Plaintiff in his written reprimand that she was being placed on a

"Performance Improvement Plan" (PIP), which was "designed for employees who are currently

failing to meet expectations in their positions."  Reprimand of Amina Elzeneiny.

       2.  *March 2011 FMLA Leave Request*

Coincidentally or not, the next day – March 9, 2011 – Plaintiff requested two weeks (or

80 hours) of FMLA medical leave, running from that day to March 22, 2011.  See Elzeneiny

Dep. Exhibits, Exh. 1 (Request for Family/Medical Leave of 3/10/2011) at 1-2.  This request was

immediately denied by Cannady in a letter dated the same day, in which he also stated that "[i]f

by Thursday, March 11, 2011 you have not reported for work, we will consider disciplinary

action, which could include termination."  Elzeneiny Dep. Exhibits, Exh. 3 (3/9/11 Denial of

Request for Leave).  Undeterred, Elzeneiny pursued her request for leave with Portia Shorter, the

District's FMLA Coordinator.  See Elzeneiny Dep. Exhibits, Exh. 1 (Request for Family/Medical

Leave of 3/10/2011).  Plaintiff then took leave for this period, although she did not receive a

paycheck while on FMLA leave.  See MSJ, Exh. 1 (10/7/2015 Deposition of Amina Elzeneiny)

at 23:20-22, 24:1-14.  Despite this, Shorter eventually formally denied Elzeneiny's leave request

on March 17, 2011.  See Request for Family/Medical Leave of 3/10/2011 at 2.  In a letter

accompanying the denial, Shorter explained that the FMLA permits "up to 16 weeks of unpaid

medical leave during any 24-month period.  [Although] Human Resources approved your request

for FMLA leave [,] . . . you have exhausted the maximum entitlement of 640 hours.  Due to the

aforementioned, I am unable to approve your request for FMLA leave."  Elzeneiny Dep.

Exhibits, Exh. 2 (3/17/2011 FMLA Denial Letter).  Despite this, Elzeneiny remained on FMLA

leave during that time.  See 10/7/2011 Elzeneiny Dep. at 18:1-22, 23:1-22.

       3.  *Termination and Appeal*

Several days later, Elzeneiny was terminated from her position in a letter dated March 22,

2011, sent from LaSharn Moreland, Director of Human Resources for the District's Office of the

Chief Financial Officer.  See Elzeneiny Dep. Exhibits, Exh. 4 (Termination Notification); see

also Declaration of Lasharn Moreland II (ECF No. 88-4), ¶ 5.  Plaintiff was given the

opportunity to appeal, which she did, arguing that the termination was unfair and in violation of

the law, that her alleged deficiencies were largely due to her disability and accompanying

medical accommodations, and that her FMLA request should have been approved because she

had last taken FMLA leave in 2009 and so was eligible for 12 weeks of leave as of March 2011.

See Moreland Decl. I, Exh. 5 (Termination Appeal Letter) at 1-2.

Although there is no documentation in the record as to why her appeal was successful,

Defendant claims "it was determined that an administrative error occurred and her FMLA

eligibility should have been considered under both Federal and District FMLA."  MSJ at 5

(citing Moreland Decl. II, ¶ 6).  The District notified Elzeneiny by letter on April 27, 2011, that

her termination had been reversed and that she had been reinstated.  See Moreland Decl. I, Exh.

6 (Termination Reversal Letter).  On the same day, Elzeneiny was also notified that her FMLA

leave had been retroactively approved.  Id., Exh.6 (4/27/2011 FMLA Notification for Amina

Elzeneiny).

Neither party makes clear what happened next.  Both sides agree that Elzeneiny did not

return to work until May 10, 2011, but it is not immediately apparent whether this was because

she sought to remain on FMLA leave or because Defendant impeded her return.  As discussed

below, Plaintiff claims that the District did not allow her to return until well past the March 22,

2011, expiration of her original FMLA leave period because she had been temporarily

terminated.  See Opp. at 3 (Plaintiff "had been scheduled to come back to work at the end of her

FMLA leave on March 23, 2011," but "was not allowed to come back to work until May 10,

2011.").  This grievance forms the core of her FMLA-interference claim.

### 4.   *May 2011 Return to Work and Dissatisfaction with New Position*

Elzeneiny's dissatisfaction with how the District handled her return does not end with

this timing issue.  On the day she finally returned to work – May 10, 2011 – Moreland notified

her that she had been "permanently reassigned" from her position of Budget Administration

Analyst in the OBP to the position of Budget Analyst (Senior) in the Economic Development

and Regulation Cluster (EDRC).  See MSJ, Exh. 7 (Permanent Reassignment Notification).

Moreland noted that with her new position, Plaintiff would "retain [her] current step, grade, and

salary."  Id.  According to Defendant, "Consideration was given to Plaintiff's skills and inability

to work in a fast paced environment," but both positions "require skill sets to develop/monitor

budgets, and develop/analyze budget expenditure reports."  MSJ at 5 (quoting Moreland Decl. II,

¶ 8 and Declaration of Cyril B[yr]on, Jr. (ECF No. 88-5), ¶ 5).  Resuming work that same day,

Elzeneiny "worked under Mr. Byron's supervision for only a couple of weeks before he

transferred [her] to work at the Department of Employment (DOES) under the supervision of

Curtis Lewis."  Id. at 6.

Both Plaintiff's FMLA-retaliation and ADA-retaliation claims spring in part from this

transfer of position.  She complains that upon returning in May 2011, she "was put in a position

that [she] didn't want . . . ."  10/7/2015 Deposition of Amina Elzeneiny at 85:21-22.  In her

deposition, she said the new budget-analyst job required "working knowledge of accounting

principles," something she did not have.  Id. at 86:1-4.  But she also claims that she "wasn't

given anything to do."  Id. at 86:9.  More specifically, it appears that she did not like the tasks

that she was assigned: process employee timesheets, conduct data entry, and participate in

training modules regarding unfamiliar software.  Id. at 87:1-91:15.  Elzeneiny avers that she did

not get to work on the "the things within the agency . . . that [she was] interested in doing that

[she] could not do at the that time," like "put the budget report for DOES together at the time of

the budget season."  Id. at 97:14-98:2.

5. *Accommodation Issues and Resignation*

In addition to complaints about her new position, Elzeneiny also testified that she "wasn't

given [her] accommodations back" after her transfer of positions, id. at 77:10-13, an allegation

that comprises part of her ADA-retaliation claim.  These accommodations were chiefly the resumption of flex time and the ability to work from home.  Id. at 78:16-18.  Elzeneiny provided no evidence as to whether she affirmatively requested her accommodations between May and July of 2011, id. at 78:19-79:6, but she states that by mid-July she had submitted her request to Curtis Lewis by email.  Id., Exh. C (8/30/2011 Email re: Flexible Work Schedule (Amina Elzeneiny)).  Addressing her accommodation requests first necessitated input from her doctors as to which accommodations were necessary for her new position, and the District's HR official was unable to obtain the completed paperwork from her doctors before Elzeneiny ultimately submitted her resignation on November 18, 2011.  See Moreland Decl. II, ¶¶ 9-10; id., Exh. 11 (various correspondence from the District to Elzeneiny's doctor); id., Exh. 12 (email correspondence between Neda Masoudian and Amina Elzeneiny concerning accommodation paperwork); Elzeneiny Dep. Exhibits, Exh. 12 (Letter of Resignation dated Nov. 18, 2011).

As the *coup de grâce*, Plaintiff also alleges that Defendant refused to provide necessary information to its disability-insurance carrier so that she would be eligible to apply for disability insurance when she requested it eight months after her termination.  See Sec. Am. Compl., ¶ 46; 1/28/2016 Declaration of Amina Elzeneiny, Exh. D (7/23/2012 Email from Amina Elzeneiny to Portia Shorter).

B.  Procedural Background

Plaintiff's original 2009 Complaint alleged only ADA, DCHRA, and Title VII claims, the last of which was dismissed in a 2010 Opinion.  See Elzeneiny v. Dist. of Columbia, 699 F. Supp. 2d 31 (D.D.C. 2010) (Elzeneiny I).  When Defendant subsequently filed its first summary-judgment motion in 2011, Elzeneiny informed the Court that she had a related matter pending before the EEOC based on additional acts of allegedly discriminatory and retaliatory conduct.

See Plaintiff's Status Report (ECF No. 25) of April 29, 2011; see also MSJ, Exh. 14 (EEOC Intake Questionnaire).  Once provided a Notice of Suit Rights by the EEOC as to those acts, Plaintiff filed her First Amended Complaint on October 31, 2011, adding a cause of action under the Family and Medical Leave Act.  Because she had not yet exhausted her administrative remedies as to other potential additional claims, however, the Court stayed the case for nearly two years while awaiting their administrative resolution.  See Docket Entry, Dec. 1, 2011. Finally receiving her second Notice of Suit Rights from the EEOC, she filed her Second Amended Complaint on November 22, 2013, adding two counts – an augmented retaliation claim under the ADA and a second expanded retaliation claim under the FMLA.

More than six years after her original Complaint was filed, then, the case finally proceeded to the first round of summary-judgment briefing on these accumulated claims, which by that point included the following counts: ADA Violation (Count I), DCHRA Violation (Count II), FMLA Interference (Count III), Retaliation under ADA (Count IV), and Retaliation under FMLA (Count V).  In its August 19, 2015, decision, the Court granted the District summary judgment on nearly all of Counts I and II – sparing only the alleged improper revocation and discontinuation of certain accommodations.  See Elzeneiny II, 125 F. Supp. 3d at 38.  As to Counts III-V, Defendants sought dismissal under Fed. R. Civ. P. 37(b)(2)(A) on the basis of Plaintiff's dilatory conduct during discovery: they complained that she had lodged supplemental claims in her twice-amended Complaint but nonetheless had never made herself available for a deposition on these new allegations.  Id. at 30.  Recognizing that Plaintiff could have been more accessible and "loath to extend this already-protracted litigation any further," id. at 32, the Court nonetheless allowed additional time for the parties to complete Plaintiff's deposition.  Having done so, the District now once more moves for summary judgment on Counts III-V.

## II.     Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).  On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence."  Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The nonmovant is

required to provide evidence that would permit a reasonable jury to find in its favor.  See

Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

**III.   Analysis**

Because the Court has already resolved Counts I and II, only Counts III-V remain. Those

include FMLA interference (Count III), ADA retaliation (Count IV), and FMLA retaliation

(Count V).  While the claims of FMLA interference and retaliation draw on the same source of

law, they involve different time periods and distinct standards.  See Roseboro v. Billington, 606

F. Supp. 2d 104, 107-08 (D.D.C. 2009) ("An employer may be held liable for violating the

FMLA under two distinct claims: (1) an interference claim under § 2615(a)(1), in which the

employer has restrained, denied, or interfered with the employee's substantive rights under the

Act, and (2) a retaliation claim under § 2615(a)(2), in which the employer has taken adverse

action against the employee because the employee took leave or otherwise engaged in activity

protected by the Act.").  At the same time, the FMLA-retaliation and ADA-retaliation counts

address the same underlying facts, but are governed by different statutes.  For ease of analysis,

the Court will first analyze Plaintiff's FMLA-interference cause of action, then look at FMLA

retaliation, and conclude with ADA retaliation.

A.  Count III: FMLA Interference

Although Plaintiff's Second Amended Complaint fails to identify precisely which events

and grievances comprise her so-called "Count III (FMLA)," in her Opposition she labels Count

III as "FMLA Interference," Opp. at 2, and focuses on Defendant's alleged interference with her

ability to exercise rights under the FMLA.

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the

exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C.

§ 2615(a)(1).  "The FMLA's central provision guarantees eligible employees 12 weeks of leave in a 1–year period following certain events: a disabling health problem; a family member's serious illness; or the arrival of a new son or daughter."  Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 86 (2002).  Although the D.C. Circuit has never clearly articulated the elements of an FMLA-interference claim, in other circuits a plaintiff employee must "prove that: (1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled." Pagel v. TIN Inc., 695 F.3d 622, 627 (7th Cir. 2012); see also Hodges v. District of Columbia, 959 F. Supp. 2d 148, 155 (D.D.C. 2013) ("To state an FMLA interference claim, a plaintiff must allege facts sufficient to show, among other things, that (1) he was entitled to take leave because he had a 'serious health condition,' (2) he gave his employer adequate notice of his intention to take leave, and (3) his employer denied or otherwise interfered with his right to take leave.") (citation omitted).

Both parties seem to agree that – after correcting the administrative error that led to the initial denial of her request – Elzeneiny was eligible and entitled to take FMLA leave in March 2011, and Defendant nowhere argues she did not provide sufficient notice of her intent to take such leave.  Plaintiff's only remaining hurdle to success, then, is establishing that "her employer denied her FMLA benefits to which she was entitled."  Pagel, 695 F.3d at 627.  Unfortunately, Plaintiff's Second Amended Complaint is not artfully pled, and her allegations as to FMLA interference in Count III and FMLA retaliation in Count V blur rather confusingly.  Compare Sec. Am. Compl., ¶¶ 40-41 (Count III) ("Defendant wrongfully terminated Plaintiff in retaliation for exercising her FMLA rights . . . and failed to reinstate Plaintiff into the same or similar

position as a senior budget analyst."), with id., ¶¶ 51-52 (Count V) ("Defendant terminated

Plaintiff while out on FMLA leave. . . [and] ultimately reinstated Plaintiff, but did not put her in

her same or similar position."). The Court must thus independently tease out the meaning of

Count III. Since the gravamen is Defendant's alleged interference with Elzeneiny's ability to

exercise her right to take leave under the FMLA on March 9, 2011, the right to return to work

between March 23, 2011, and May 9, 2011, and the loss of pay and benefits during this time

period, see Opp. at 2-3, this is where the Court will focus. It will, conversely, address her

grievances concerning whether the position she returned to was "the same or similar" in Count

V.

Turning now to the interference claim, the Court preliminarily notes that ultimately

Elzeneiny was retroactively granted unpaid FMLA leave for the period of March 9-22, 2011, and

her termination was revoked. The period in dispute, then, runs from March 23 to May 9, 2011,

during which time both parties agree that Elzeneiny went without pay and did not return to her

position. See Def. Supplemental Statement of Undisputed Material Facts (ECF No. 88-7), ¶ 28.

Plaintiff argues that the improper denial of her right to return entitles her to recover lost income,

employment benefits, and other remedies available under the FMLA. See Opp. at 5-6 (citing 29

U.S.C. § 2617(a)(1)(A)).

In seeking summary judgment, the District seems to provide two somewhat contradictory

explanations for her delay in returning. It first attributes the delay to her apparent desire to

remain on FMLA leave. Pointing to the deposition testimony of the District's HR director,

Defendant contends that the reason "she did not receive a pay check for the time she was on

FMLA (March and May of 2011) [was] because she had exhausted all of her available paid leave

and leave does not accrue while an employee is on FMLA," implying that Elzeneiny had

voluntarily remained on leave and forfeited her pay and other benefits.  See Moreland Decl., ¶ 7.

Despite the District's simple explanation, however, the record does not clearly reflect that

Plaintiff sought FMLA leave all the way to May 10, 2011.  When Defendant reinstated

Elzeneiny, it retroactively granted her FMLA leave from March 9 to April 24, 2011, but while

such leave was "approved" by the District, there is no evidence that Elzeneiny sought leave

during this longer period, and Defendant has not provided a request completed or signed by her,

only one completed by the District.  See 4/27/2011 FMLA Notification for Amina Elzeneiny.

The only relevant evidence submitted regarding her need to take FMLA leave is

correspondence from Mahmoud Mustafa – her doctor – that was provided by the parties and

shows that he "recommend[ed] that she take two weeks off [beginning on March 9] due to illness

. . . [and would] reevaluate her medical condition and make further recommendations in two

weeks time." 1/28/2016 Elzeneiny Decl., Exh. B (Mustafa Letter of March 8, 2011).  Neither

party has explained what Dr. Mustafa subsequently determined as to Elzeneiny's suitability to

return to work, but both agree that her initial request to take FMLA leave was only for the above-

referenced two-week period, from March 9 to March 22, 2011.  See Def. Supp. SUMF, ¶ 8;

Elzeneiny Dep. Exhibits, Exh. 1 (Request for Family/Medical Leave).

A jury could find that the reason she did not return after March 22 was that she had

received a letter dated that same day terminating her employment.  See Def. Supp. SUMF, ¶ 13;

Termination Notification.  Elzeneiny then appealed her termination, and it was ultimately

determined on April 27, 2011, that she was eligible for FMLA leave and that she should be

reinstated.  See Def. Supp. SUMF, ¶¶ 25-27.  In her declaration, Elzeneiny states that she "would

have returned to work [on March 23] had [she] not been terminated . . . ." 1/28/2016 Elzeneiny

Decl., ¶ 7.[1]  In her deposition, furthermore, Elzeneiny stated that the reason she did not receive pay between March 23 and May 10 was that "[she] was terminated," 10/7/2015 Elzeneiny Dep. at 45:10-17, not because she was on voluntary FMLA leave.

Other documentary evidence provided by the parties, moreover, suggests that Elzeneiny was eager to return and did not seek to extend her FMLA leave.  Earlier in the same email thread regarding her need for a doctor's note, Plaintiff stated that she was "anxious to get back to work. I haven't had a paycheck for several weeks.  Please call me back as soon as possible to work out the details of my getting back to work."  1/28/2016 Elzeneiny Decl., Exh. C (5/9/2011 Email from Amina Elzeneiny to LeSharn Moreland).  She also appears to have both called and emailed District officials after receiving word of her successful termination appeal – presumably to communicate about her return to work – and her efforts began weeks before she was subsequently permitted to return.  See 1/28/2016 Elzeneiny Decl., Exh. C (5/3/2011 Email from Amina Elzeneiny to LeSharn Moreland) ("I wanted to follow up on the voicemail messages that I left you and Portia on Friday 4/29/11 regarding the letter . . . that I was reinstated with the OCFO and that if I had any questions to call . . . .").  Earlier in that email thread, Elzeneiny appears eager to seek resolution of her appeal.  Id. (4/11/2011 Email from Amina Elzeneiny to Lesharn Moreland) ("I wanted to follow up on my Appeal . . . What is the deadline that I should expect to hear from you on the result of my appeal?").  A factfinder could conclude from this that the reason Plaintiff stayed home during this period was not out of choice but because she was not yet allowed to return.

---

[1] In her Declaration of January 28, 2016, Elzeneiny states that she was scheduled to return to work on March 24, 2011, but in all other places, including in her FMLA leave request, that date was to be March 23, 2011. See FMLA Request.

Defendant in the alternative argues that the reason for the delay in her return to work was because "she was not cleared by her doctor to return to work until May 9, 2011."  Reply at 5. This explanation is problematically vague.  Defendant has not alleged that it ever affirmatively notified Elzeneiny of the need to obtain a fitness-for-duty certification prior to her reinstatement. In some circumstances, imposing such a requirement is permissible under the FMLA, but only when such a policy is uniformly applied to all similarly situated employees.  See Bloom v. Metro Heart Group of St. Louis, Inc., 440 F.3d 1025, 1030 (8th Cir. 2006) (citing 29 U.S.C. § 2614(a)(4); 29 C.F.R. § 825.310(a)) ("An employer may require medical certification demonstrating fitness-for-duty, as long as this policy or practice is uniformly applied to all similarly-situated employees who take leave for serious health conditions").  Defendant has also not provided evidence of such a policy.

In addition, there is also no indication anywhere in the record concerning what Elzeneiny's doctor recommended between the period of March 22 and May 9, 2011, nor any indication that Mustafa ever affirmatively prohibited Plaintiff from returning to work once her position had been reinstated or her scheduled two weeks of FMLA leave had expired.  While the District maintains that she was not cleared by her doctor to return to work, its only evidence is an email Elzeneiny sent to Moreland on May 9, 2011, in which she mentioned that she was "able to pick up a letter from my doctor with his permission to return to work."  1/28/2016 Elzeneiny Decl., Exh. C (Letter from Amina Elzeneiny to LaSharn Moreland of 5/9/2011).  Given that inferences must be drawn in favor of the nonmoving party at summary judgment, this simply is not sufficient to establish that Elzeneiny's doctor had refused to permit her to return to work until then.

As the Court finds a genuine dispute of material fact as to the reasons for the delay in Elzeneiny's return to work until May 10, 2011, it will not grant Defendant summary judgment as to the FMLA-interference claim stemming from her absence during this period.

B.  Count V: FMLA Retaliation

Next up is Plaintiff's other FMLA count.  The focus of Count V is Her contention that "[i]n retaliation" for taking FMLA leave, "Defendant terminated Plaintiff while out on FMLA leave," "did not put her in her same or similar position" when she was reinstated, and "placed Plaintiff in a different position and gave her almost no job duties and no work" and "[w]hat little work Defendant did give Plaintiff to perform was mostly data entry work."  Sec. Am. Compl., ¶¶ 51-54.  Elzeneiny also alleges in Count V that "Defendant harassed Plaintiff, created a hostile work environment, constructively discharged Plaintiff, and refused to provide the necessary information to its disability insurance carrier so that Plaintiff could be eligible for disability insurance."  Id., ¶ 56.

As a preliminary note, the Court has already adjudicated the merits of Plaintiff's hostile-work-environment and constructive-discharge claims in its earlier Opinion, and so her reiteration of those issues here is moot.  See Elzeneiny II, 125 F. Supp. 3d at 42, 43 (finding that "largely isolated incidents over the course of eight years do not amount to an abusive working environment" and "[a]bsent any attempt on the part of Plaintiff to resolve her concerns about her reduced job responsibilities, the situation had not become so clearly permanent that resignation was a fitting response").

Her remaining retaliation claims under 29 U.S.C. § 2615(a)(2) – termination, reassignment, and refusal to provide information – are analyzed under the familiar McDonnell Douglas Title VII framework in this circuit.  See Gleklen v. Democratic Cong. Campaign

Comm., Inc., 199 F.3d 1365, 1367 (D.C. Cir. 2000) ("in view of the general similarity of the

Leave Act, the McDonnell Douglas approach offers a coherent method of evaluating the

evidence for . . . alleged violations"); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05

(1973).

      Under D.C. Circuit precedents importing the Title VII framework to a claim of FMLA

retaliation, Elzeneiny may proceed in one of two ways.  "First, [she] can make use of the

McDonnell Douglas evidentiary framework to establish that [her protected activity under the

FMLA] was the but-for cause of the challenged personnel action."  Ford v. Mabus, 629 F.3d 198,

207 (D.C. Cir. 2010) (emphasis added).  Under this approach, a plaintiff carries the initial burden

of establishing a *prima facie* case of discrimination by a preponderance of the evidence. See

Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981); Kersey v. Washington

Metro. Area Transit Auth., 586 F.3d 13, 17 (D.C. Cir. 2009).  Elzeneiny must show that (1) she

engaged in a protected activity under this statute; (2) her employer took a materially adverse

action against her; and (3) the employer took the action because of her protected activity, an

analytical framework "essentially the same" as a Title VII retaliation claim.  See McFadden v.

Ballard Spahr Andrews & Ingersoll, LLP, 611 F.3d 1, 6 (D.C. Cir. 2010).

      Defendant then has the burden to rebut that *prima facie* case with evidence of "a

legitimate, nondiscriminatory . . . reason for its actions."  Kersey, 586 F.3d at 17 (quoting Reeves

v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (internal quotation marks

omitted)).  "This burden is one of production, not persuasion; it can involve no credibility

assessment."  Reeves, 530 U.S. at 142 (citation and internal quotation marks omitted).  If the

defendant has produced such evidence, then the plaintiff must show by a preponderance of the

evidence that "the legitimate reasons offered by the defendant were not its true reasons, but were

a pretext for discrimination." Id. at 143 (internal quotation marks omitted). This three-step

process differs slightly at the summary-judgment stage; if the defendant can offer a legitimate

reason for the challenged action, then district courts may skip over the first step of the analysis,

since in such circumstances "the *prima facie* case is a largely unnecessary sideshow." Brady v.

Office of the Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008).

In the alternative, a plaintiff "may [also] establish liability by showing that [the protected

activity] was a factor in the challenged personnel action." Ford, 629 F.3d at 207.  Under this

approach, a plaintiff may prevail even "where the employer acted with mixed motives." Id. at

203.  "Specifically, 'once a plaintiff . . . shows that [discriminatory animus] played a motivating

part in an employment decision, the [employer] may avoid a finding of liability only by proving

that it would have made the same decision even if it had not allowed [discriminatory animus] to

play such a role.'" Id. at 203-04 (quoting Price Waterhouse v. Hopkins, 490 U.S. 228, 244-45

(1989)).

The continuing viability of this latter, "mixed-motives" method of establishing liability

for FMLA retaliation is in flux, however, due to recent developments a few blocks away at One

First Street.  In University of Texas Southwestern Medical Center v. Nassar, 133 S. Ct. 2517

(2013), the Supreme Court held that to prevail on a retaliation claim under Title VII, a plaintiff

must meet the "traditional principles of but-for causation." Id. at 2533 (emphasis added).  The

Court held that demonstrating that the protected activity was merely a "motivating factor" in an

employer's adverse action was insufficient to establish retaliation. Id.  While FMLA-retaliation

claims largely swim in sync with Title VII claims, the D.C. Circuit has yet to interpret the effect

of this decision in the FMLA-retaliation context, and lower courts in other circuits have come to

seemingly different conclusions. See Nigh v. Sch. Dist. of Mellen, 50 F. Supp. 3d 1034, 1054

(W.D. Wis. 2014) (collecting cases).  Because neither the Supreme Court nor the D.C. Circuit

has "addressed the viability of a mixed-motive claim under the FMLA," Breeden v. Novartis

Pharmaceuticals Corp., 646 F.3d 43, 49 n.3 (D.C. Cir. 2011), the Court will consider Plaintiff's

claim under both standards where relevant.

Returning to the controversy at hand, neither party disputes that Plaintiff's decision to

take FMLA leave from March 9 to March 22, 2011, was a protected activity.  See Def. Supp.

SUMF, ¶ 27 ("OCFO . . . approved her FMLA, effective March 9, 2011").  Based on Plaintiff's

Second Amended Complaint, Defendant's allegedly adverse actions relating to her FMLA-

retaliation count include "terminat[ing] Plaintiff while out on FMLA leave," "plac[ing] Plaintiff

in a different position and [giving] her almost no job duties and no work" after reinstating her,

and "refus[ing] to provide the necessary information to its disability insurance carrier so that

Plaintiff could be eligible for disability insurance."  Sec. Am. Compl., ¶¶ 51-54, 56.  The Court

will assess each of these claims in order.

### 1. *Termination and Delay in Reinstatement*

As to the termination itself, Defendant wisely concedes that termination can constitute an

adverse action.  See Def. MSJ at 15.  The District argues, however, that "Plaintiff's March 2011

termination never became final" since she was permitted to appeal, succeeded on this appeal, and

was eventually reinstated.  Id.  It thus concludes that "Plaintiff was not subjected to an adverse

employment action based on the very brief period of proposed termination."  Id.

It is true that "[a]n employer may cure an adverse employment action – at least one of the

sort here alleged – before that action is the subject of litigation."  Taylor v. Small, 350 F.3d

1286, 1293 (D.C. Cir. 2003).  The flaw in Defendant's position, however, is that it did not fully

cure the adverse action when it reinstated Plaintiff.  As noted in Elzeneiny's FMLA-interference

claim above, she contends that she "lost income and other benefits from the period March 23, 2011, when she was originally scheduled to come back to work, and May [1]0, 2011, when she was allowed to return to work after prevailing on the appeal of her termination."  Opp. at 5. Since Plaintiff has never received backpay for the period between March 22 and May 9, 2011, the temporary termination – insofar as it has not been fully cured – thus constitutes an adverse action.

The Court need not delve deeper, however, because the relief sought by Plaintiff here is identical to that dismissed in the FMLA-interference claim above.  <u>See</u> Opp. at 3, 5.  For the reasons stated in Section III.A, *supra*, the Court finds a genuine dispute of material fact as to the reasons for the delay in Elzeneiny's return to work, and so it will also not grant Defendant summary judgment as to the FMLA-retaliation claim stemming from Elzeneiny's absence during this time.  Because this period is coterminous with the period in question on the FMLA-interference claim, both the injury and any potential recovery is essentially identical under both counts.

## 2.  *Reassignment Upon Reinstatement*

Elzeneiny next contends that when she was reinstated after successfully appealing her termination, she was retaliatorily placed "in a different position" and given "almost no job duties and no work" other than "mostly data entry work."  Sec. Am. Compl., ¶¶ 52-55.  Defendants counter that "[c]ompelling reasons existed for the decision[] . . . to re-assign her to EDRC/DOES and give her less time sensitive assignments."  MSJ at 18.

Of course, while a "tangible employment action [can] constitute[] a significant change in employment status, such as . . . reassignment with significantly different responsibilities," <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742, 761 (1998), "the FMLA does not mandate

that employers reinstate employees who are unable to perform the essential functions of their

positions." Battle v. United Parcel Serv., Inc., 438 F.3d 856, 864 (8th Cir. 2006). "[A]n

employer "has no duty under the FMLA to return an employee to his or her position, if that

employee cannot perform an essential function of the job." James v. Hyatt Regency Chicago,

707 F.3d 775, 780-81 (7th Cir. 2013) (citing 29 C.F.R. § 825.214(b) ("Employee right to

reinstatement")). Nor does the FMLA require "an employer to provide a reasonable

accommodation to an employee to facilitate his return to the same or equivalent position at the

conclusion of his medical leave." Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 384 (3d Cir.

2002) (citation and quotation marks omitted); see also 29 C.F.R. § 825.214(b); cf. Etheridge v.

FedChoice Fed. Credit Union, 789 F. Supp. 2d 27, 40 (D.D.C. 2011) ("An employer's

obligations under the FMLA are wholly distinct from its obligations to provide a reasonable

accommodation under the ADA.").

As to Plaintiff's FMLA-retaliation claim, then, the Court need not delve deeply into the

job descriptions of the different positions. After all, even if her job description had changed, as

long as Defendant can provide legitimate, nonretaliatory reasons for her shift to a different role,

then such shift does not constitute retaliation unless Plaintiff can "produce substantial probative

evidence" that the District's explanation is "not true" and the "real reason" was retaliation for her

taking FMLA leave. See Gleklen, 199 F.3d at 1367-68.

If establishing a legitimate, nondiscriminatory reason for Defendant's actions requires a

base hit, the District has delivered a home run. As discussed at length above, Cannady had

identified numerous and ongoing deficiencies with Elzeneiny's work performance and ability to

perform her job. He concluded that she did not have the skills to carry out her duties and had

failed to complete a number of critical assignments and was unable to explain why; many of

these concerns had been corroborated by other analysts in the office.  <u>See</u> Recommendation to Terminate Employment at 1.  He found that her ability to use the financial system of record was below what would be expected of her position, and he had to reassign her responsibilities to other analysts.  <u>Id.</u>  Worse, he had doubts about her honesty in reporting her hours when she worked from home, for the amount of work she produced did not reasonably correspond to the hours she claimed it took.  <u>Id.</u> at 2.

Cannady further stated in his declaration that he had noticed that she had to be excused from completing her assigned work in past budget seasons as well, and that she used other analysts to cover for her deficiencies by getting them to do her work.  <u>See</u> Cannady Decl. I, ¶¶ 4-5.  Cannady was also not the only one to observe Plaintiff's poor performance.  One of her acting supervisors found she "was either unable or unwilling" to "fully engage in the budget formulation process."  Recommendation to Terminate Employment at 2.  Another supervisor felt that "she seemed ill-equipped to carry-out the duties of a Budget Administration Analyst.  He was very concerned with her inability to cope during the formulation process."  <u>Id.</u>  As Defendants explain, the OCFO/OBP is responsible for assisting the Mayor and City Council in developing the $12.7 billion operating budget and this work involves "a very rigid timeline."  MSJ at 18-19.  It is abundantly clear from the record that whatever the reason, Plaintiff simply was unable to do the essential functions of her job that the OBP needed to meet its own deadlines and keep the wheels of the city government turning.

In her Opposition, Plaintiff makes almost no effort to contradict Defendant's claim that she was unable to fulfill essential functions of her role.  She argues that the claim of "serious performance issues is disingenuous at best" because "there would be no reason to reinstate her" after her termination if she really did have serious performance issues.  <u>See</u> Opp. at 7.  Given her

history of litigious behavior with the District, her statement seems facetious at best.  Yet it also

misses the point: she had been placed on the PIP the day <u>before</u> she sought to take FMLA leave,

the objective of which was to provide support in correcting her deficiencies not to terminate her

outright.

Elzeneiny also endeavors to rebut these reasons by alluding to the accommodations she

had sought.  Elsewhere in her Opposition, she blames "her physician's request that she be put on

light duty" for her deficient performance.  <u>Id.</u> at 6.  To Plaintiff's detriment, however, whether or

not she sought accommodations is irrelevant to determining whether Defendant had a legitimate

reason for shifting her position.  The "FMLA omits any requirement that employers seek to

reasonably accommodate employees who cannot perform the essential functions of their

respective positions.  Any duty to accommodate the employee is governed solely by the ADA."

<u>Battle</u>, 438 F.3d at 865 (citing 29 C.F.R. § 825.214(b) & <u>Tardie v. Rehab. Hosp. of Rhode

Island</u>, 168 F.3d 538, 544 (1st Cir.1999)); <u>see also</u> <u>Etheridge</u>, 789 F. Supp. 2d at 40 ("The FMLA

contains no such accommodation requirement and . . . an employer's obligations under the

FMLA are wholly distinct from its obligations to provide a reasonable accommodation under the

ADA.").

In short, Defendant has provided an abundance of evidence that Plaintiff was unable to

perform her role as budget-administration analyst at OBP sufficient to rebut both the "motivating

factor" and "but-for causation" methods of establishing liability.  <u>Cf.</u> <u>Gleklen</u>, 199 F.3d at 1368

("[Plaintiff] believes this was an elaborate pretext . . . but she fell far short of rebutting

[Defendant's] more plausible explanation for its actions.").  As the Court concludes that Plaintiff

has failed to "produce substantial probative evidence" that the reason for her relocation was

retaliatory, it will grant Defendant summary judgment as to the portion of Plaintiff's FMLA-

retaliation count concerning the conditions of her employment after her resumption of work on May 10, 2011.

### 3. *Disability-Insurance Information*

Last and (perhaps) least, Plaintiff claims that the District retaliated against her for taking FMLA leave by refusing to provide its insurance carrier with necessary information so that she could be eligible for disability insurance. See Sec. Am. Compl., ¶ 56. Defendant argues that Elzeneiny has failed to provide evidence of damages stemming from this allegation, a predicate to making out a claim under the FMLA. See MSJ at 22 ("[T]here is no admissible evidence that Plaintiff sustained any monetary losses."); see also Coleman v. Potomac Elec. Power Co., 281 F. Supp. 2d 250, 254 (D.D.C. 2003) ("Recovery under FMLA is 'unambiguously limited to actual monetary losses.'") (quoting Walker v. United Parcel Service, Inc., 240 F.3d 1268, 1277 (10th Cir. 2001)). The District contends that while Elzeneiny alleges she to have lost out on approximately $1,200 per month in insurance payments, she "testified that she never received a letter fron [*sic*] Colonial denying her claim," id. at 22 (citing 10/7/2015 Elzeneiny Dep. at 132:20-134:11), and has offered no other evidence to support this allegation. Plaintiff's seven-page Opposition, moreover, makes no effort to rebut Defendant's position on to damages, focusing solely on the question of exhaustion of her ADA-retaliation claim (discussed next). Because Plaintiff has failed to provide affirmative evidence of actual damages, the Court will grant Defendant summary judgment as to this issue.

### C. Count IV: ADA Retaliation

In addition to retaliation under the FMLA, Plaintiff also contends that she was retaliated against in violation of the ADA in myriad ways. The ADA prohibits employers from retaliating against employees who engage in protected activity under the statute. See 42 U.S.C § 12203(a)

("No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."). As with FMLA-retaliation claims, the D.C. Circuit employs the McDonnell Douglas Title VII burden-shifting framework in analyzing ADA-retaliation suits under § 12203(a). See Smith v. Dist. of Columbia, 430 F.3d 450, 455 (D.C. Cir. 2005). Mirroring the burden on her FMLA-retaliation claim, then, Plaintiff must establish that she engaged in protected activity, that she was subjected to adverse action by the employer, and that there existed a causal link between the adverse action and the protected activity. Id. (citing Jones v. Wash. Metro. Area Transit Auth., 205 F.3d 428, 433 (D.C. Cir. 2000)).

Neither party disputes that Elzeneiny engaged in protected activity when she requested accommodations for her disability, pursued administrative remedies, and ultimately filed this lawsuit. As to the allegedly adverse actions, she points to a litany of 2011 events that were not resolved by this Court's prior summary-judgment decisions. See Elzeneiny II, 125 F. Supp. 3d 18. More specifically, Plaintiff alleges that Defendant "removed the accommodations it had previously provided, continued to refuse to provide accommodations, . . . and refused to provide the necessary information to its disability insurance carrier so that Plaintiff could be eligible for disability insurance." Sec. Am. Compl., ¶ 46. Her list of complaints continues:

> Defendant has been indiscreet about Plaintiff's disability and her request for accommodations in the workplace, attempted to communicate directly with Plaintiff's medical provider without her permission, made negative comments about her disability and her work performance opening in the workplace, accused her of wrongdoing when there was no evidence of wrongdoing, failed to provide her with proper performance evaluations, failed to promote her, interfered with her ability to complete her work, and rummaged through her personal belongings.

Id., ¶ 47.

The District's primary defense is that Plaintiff has failed to exhaust her administrative remedies as to most of these discrete acts of alleged retaliation; unlike the FMLA, the ADA has strict administrative-exhaustion requirements.  The Court will thus begin by considering this argument, which knocks out many of Plaintiff's grievances, and then address the merits of the remaining claims she did properly exhaust.

### 1.  *Administrative Exhaustion*

As this Court explained in its earlier summary-judgment decision, it is well established that "[b]efore bringing suit in federal court, ADA plaintiffs, like those under Title VII, must exhaust their administrative remedies by filing an EEOC charge and giving that agency a chance to act on it."  Marshall v. Fed. Exp. Corp., 130 F.3d 1095, 1098 (D.C. Cir. 1997) (citing 42 U.S.C. § 12117(a) and Park v. Howard Univ., 71 F.3d 904, 907–09 (D.C. Cir. 1995)); see also 42 U.S.C. § 12117 (incorporating procedural provisions of Title VII for ADA causes of action); Mayers v. Laborers' Health & Safety Fund of North America, 478 F.3d 364, 368 (D.C. Cir. 2007) ("The ADA incorporates the procedural provisions of Title VII of the Civil Rights Act of 1964 . . . .").  Such a charge must be filed "within a specified period . . .  after the alleged unlawful employment practice occurred."  Hodge v. United Airlines, 666 F. Supp. 2d 14, 20 (D.D.C. 2009) (quoting Ledbetter v. Goodyear Tire & Rubber Co., Inc., 550 U.S. 618, 623-24 (2007)). Specifically, an aggrieved individual must file a charge within 180 days of the alleged discriminatory act, unless she has "instituted proceedings with a State or local agency with authority to grant or seek relief from such practice," in which case she must file the charge within 300 days.  See 42 U.S.C. § 2000e–5(e)(1).  The District has previously conceded that

Plaintiff had the benefit of the longer 300-day filing window.  See Def. Sec. MSJ (ECF No. 74) at 25.

The city nonetheless points out that Plaintiff never specified some of the alleged acts of retaliation in either her initial EEOC Intake Questionnaire dated January 20, 2012, or in her supplemental Charge of Discrimination dated January 7, 2013, see Elzeneiny Dep. Exhibits, Exh. 13 (Charge of Discrimination), thus failing to exhaust those claims.  It also contends that some of her charges raised only in the supplemental Charge of Discrimination were not timely filed, as they do not relate back to the grievances that she raised in her original EEOC Intake Questionnaire.  The Court will tackle each issue in turn.

a.   Charges Absent From Both EEOC Documents

First, Defendant is correct that some of the discrete acts of retaliation Elzeneiny identifies in her Second Amended Complaint are absent from both her intake questionnaire and her supplemental charge.  While "every detail of the eventual complaint need not be presaged in the EEOC filing, . . . the substance of an ADA claim, like that of a Title VII claim, must fall within the scope of 'the administrative investigation that can reasonably be expected to follow the charge of discrimination.'"  Marshall v. Fed. Exp. Corp., 130 F.3d 1095, 1098 (D.C. Cir. 1997) (quoting Park v. Howard University, 71 F.3d 904, 907 (D.C. Cir. 1995)).  This is because "'[a]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role [and] deprive the charged party of notice of the charge. . . .'"  Id. (quoting Schnellbaecher v. Baskin Clothing Co., 887 F.2d 124, 127 (7th Cir.1989)).  The Court will therefore compare the two administrative filings against her Second Amended Complaint and eliminate any contentions that the former "do[] not fairly embrace."  Id.

In her questionnaire, filed on January 20, 2012,[2] she complains of "[r]etaliation for filing prior discriminat[ion] complaints and failure to provide accommodations," that "[r]equests for accommodation were ignored . . . [, and that she] was not given any reason for change in position and job duties." EEOC Intake Questionnaire at 2. Elzeneiny was more thorough in her supplemental charge, filed nearly a year later, on January 7, 2013:

> To supplement my filing of January 20, 2012, as part of continuing retaliation against me for filing two EEOC charges and filing a lawsuit, was wrongfully terminated on March 23, 2011, while I was out on leave because of my disability. On April 27, 2011, I was reinstated in my employment, but put in a different position and given very few assignments. Most of the time I was not given any work to do; and when I was given work, it was mostly data entry. I asked my employer for accommodations for my disability numerous times and my requests were ignored. . . . Since my discharge, my prior employer continued to retaliate against my [*sic*] refusing to provide the necessary paperwork I needed to file for disability insurance.

Charge of Discrimination.

In her Complaint, however, Plaintiff additionally alleges that Defendant was "indiscreet about [her] disability," "attempted to communicate directly with [her] medical provider without her permission," "made negative comments about her disability and her work performance opening the workplace," "accused her of wrongdoing," "failed to provide her with proper performance evaluations," "failed to promote her," "interfered with her ability to complete her work," or "rummaged through her personal belongings." Sec. Am. Compl., ¶ 47. Elzeneiny made no mention in either administrative document of any of these discrete acts of retaliation,

---

[2] Although the form is signed and dated January 20, 2011, Plaintiff explains that this was a typographical error on the part of her attorney. See Opp. at 3-4 ("Although the questionnaire is dated January 20, 2011, Plaintiff's counsel inadvertently wrote 2011 instead of 2012, as demonstrated by the EEOC date stamp showing that it was filed on "2012 Jan 20."). Defendant appears to acknowledge the latter date as proper one. See Reply at 4 (identifying "January 20, 2012 Intake Questionnaire").

and "a vague or circumscribed EEOC charge will not satisfy the exhaustion requirement for claims it does not fairly embrace."  <u>Marshall</u>, 130 F.3d at 1098.  Defendant is thus correct that Plaintiff has failed to exhaust her administrative remedies as to these last allegations, and the Court will thus not consider them as part of her ADA-retaliation claim.

b.   Claims Raised Only in Supplemental Charge

The next question is whether three claims identified only in the supplemental charge, but not in the intake questionnaire, have been exhausted.  First, it is only in Plaintiff's supplemental charge that she complains about the <u>substance</u> of the new position into which she was transferred, <u>see</u> Charge of Discrimination ("I was . . . put in a different position and given very few assignments. Most of the time I was not given any work to do; and when I was given work, it was mostly data entry."), although there is a brief mention of the fact of that change in the intake questionnaire.  <u>See</u> EEOC Intake Questionnaire at 2 ("[I] was not given any reason for change in position and job duties.").  Second, Plaintiff raised her allegedly unlawful termination only in her supplemental charge, not in her initial questionnaire.  Third, Defendant's alleged refusal to provide necessary information to its insurer is mentioned only in her supplemental charge and not in the original intake questionnaire at all.

The District's theory is that Plaintiff's "300 day filing period expired on January 17, 2012[,] but Plaintiff did not file her supplemental charge until January 7, 2013, almost one year after the filing period expired," MSJ at 11, and so any claims raised only in her supplemental charge came too late to be administratively exhausted.  Plaintiff counters that because the allegations raised for the first time in her supplemental charge relate back to her original EEOC charge, those claims were in fact administratively exhausted.  Opp. at 4-5.  The relevant EEOC regulation concerning charges that relate back provides in part that

> [a] charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein. Such amendments and amendments alleging additional acts which constitute unlawful employment practices <u>related to or growing out of the subject matter of the original charge</u> will relate back to the date the charge was first received. A charge that has been so amended shall not be required to be redeferred.

29 C.F.R. § 1601.12(b) (emphasis added).

The Court thus looks to see whether the three acts mentioned above so qualify. First, as to concerns about her new position, Elzeneiny's initial intake questionnaire specified that she "was not given any reason for change in position and job duties," EEOC Intake Questionnaire at 2, and her supplemental charge elaborates that she was "put in a different position and given very few assignments. Most of the time I was not given any work to do, and when I was given work, it was mostly data entry." Charge of Discrimination. As these more specific allegations are "related to or grow[] out of the subject matter of the original charge," the Court finds that they do relate back to her original EEOC filing.

Second, the complaint related to termination in her supplemental charge, however, does not. Because the intake questionnaire makes no mention of her termination, her allegation that she was "wrongfully terminated on March 23, 2011," Charge of Discrimination, does not relate back to the initial charge. Both her temporary (and revoked) termination on March 23, 2011, and her ultimate discharge on November 18, 2011, took place more than 300 days before her supplemental charge was filed on January 7, 2013, and so Defendant is correct that Plaintiff failed to exhaust her administrative remedies as to these charges.

Finally, Elzeneiny has exhausted her grievance that Defendant failed to provide necessary information to its insurance carrier. Because "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment

32

practice,'" <u>National R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 114 (2002), the relevant date

on which the 300-day countdown would begin is the date the incident of alleged retaliatory

action took place.  Plaintiff appears to have first requested information on behalf of the disability

insurer in a July 23, 2012, email to Portia Shorter, so this date is the earliest possible date upon

which the alleged retaliatory practice could be said to have occurred.  <u>See</u> 7/23/2012 Email from

Amina Elzeneiny to Portia Shorter at 1.  Although this is not strictly a relate back question, since

Plaintiff raised this issue in her supplemental charge of discrimination on January 7, 2013 – well

within the 300-day window – she properly exhausted this charge.

* * *

What remains?  Plaintiff's Second Amended Complaint does include the claim that once

she was reinstated, her requests for accommodations were ignored, and Defendant concedes that

she exhausted her administrative remedies as to that concern.  <u>See</u> Reply at 2-3 ("The District

has not argued that Plaintiff failed to exhaust administrative remedies as to" "her requests for

accommodations relating to a flexible work schedule, telework, job reassignment.").

In sum, then, the Court finds that Plaintiff has exhausted her administrative remedies only

as to the following allegations of ADA retaliation: the District's denial of accommodations after

reinstatement, it reassigning her into a less interesting position, and its refusal to provide

necessary information to its insurance company in furtherance of her quest for disability

insurance.  All other allegations raised in her Second Amended Complaint and/or in her

deposition of October 7, 2015, were not properly exhausted and are thus barred.  The Court now

moves to the three surviving issues.

2.   *Remaining ADA Retaliation Claims*

a.   Retaliatory Reassignment and Lack of Responsibilities

Plaintiff's first set of surviving ADA-retaliation claims – that Defendant retaliated against

her by placing her in a new position and giving her fewer and reduced responsibilities – meets a

fate similar to her parallel complaints sounding in FMLA retaliation.  As discussed above, the

city has provided an abundance of evidence suggesting that the reason for Plaintiff's switch in

job title and responsibilities was her ongoing performance deficiencies.  The burden then shifts

back to Elzeneiny to provide sufficient evidence that the District's non-retaliatory reason was not

the actual reason, and that the District instead intentionally retaliated against her.  See Holcomb

v. Powell, 433 F.3d 889, 896-97 (D.C. Cir. 2006).  Plaintiff, however, offers no rebuttal at all to

Defendant's evidence of legitimate, nondiscriminatory reasons for relocating Elzeneiny and

altering her job assignments.  In her brief, seven-page Opposition, she devotes her entire

discussion of the ADA-retaliation claim to the exhaustion question.  Absent any contrary

evidence or argument, no reasonable trier of fact "could find that the employer's asserted non-

discriminatory reason was not the actual reason and that the employer intentionally discriminated

against the employee . . . ."  Brady, 520 F.3d 490, 494.  The Court will accordingly grant

Defendant's Motion for Summary Judgment as to this claim.

b.   Denial of Accommodations

In contrast, Plaintiff's allegations of retaliation in the form of denial of accommodations

once she returned in May 2011 do survive.  Turnabout being fair play, this time it is the District

that offers no argument anywhere in its Motion either that the denial of accommodations Plaintiff

requested after her May 2011 resumption of work was not an adverse employment action or that

it made a good-faith effort to accommodate her after reinstatement.  Plaintiff's ADA-retaliation count may thus proceed on this question.

### c.  Disability-Insurance Information

Finally, Plaintiff repackages her above claim that the District retaliated against her by "refus[ing] to provide the necessary information to its disability insurance carrier so that Plaintiff could be eligible for disability insurance."  Sec. Am. Compl., ¶ 46.  As with Elzeneiny's denial-of-accommodation claim, Defendant does not discuss the merits of this claim in its Motion; instead, it focuses solely on the question of exhaustion.  See MSJ at 11.  Nor has the District maintained that the ADA has an actual-damages requirement, as it did with the FMLA variation on this claim discussed above.  Having put all its eggs in the exhaustion basket, then, Defendant cannot obtain summary judgment on this issue.

## IV.   Conclusion

Having thoroughly traversed the terrain of Plaintiff's Second Amended Complaint, the Court can at last identify which of her many grievances remain to go to trial.  Plaintiff's Count III FMLA-interference claim survives as to damages stemming from her absence from work between March 23 and May 9, 2011, and the same fact controversy also survives in her Count V FMLA-retaliation claim.  The District prevails as to all other claims raised under these counts. As to Count IV (ADA), the only allegedly retaliatory acts that may proceed are Plaintiff's denial-of-accommodations claim for the period from May 10 to November 25, 2011, and her grievance related to the District's refusal to provide necessary information to its insurance provider.  The Court will otherwise grant Defendant's Motion for Summary Judgment as to all other claims arising under these three counts, as the accompanying Order will so state.

<u>/s/ James E. Boasberg</u>
JAMES E. BOASBERG
United States District Judge

Date:  <u>July 1, 2016</u>